1  Hoyt E. Hart II SBN 125088
2  Attorney at Law
3  PO Box 675670
   Rancho Santa Fe, CA 92067
4  hoyth@prodigy.net
5  (858) 756-1636

6
7  Michael Deuschel
   Plaintiff in Pro per
8  P.O. Box 1694
9  El Segundo, CA 90245
   (323) 620-1231
10 mdeuschel@yahoo.com

11
                    UNITED STATES FEDERAL COURT
12
                    CENTRAL DISTRICT OF CALIFORNIA
13

14 MICHAEL DEUSCHEL,                        Case No.: _____
15              Plaintiff,

16 vs.
17                                          COMPLAINT FOR DAMAGES

18 Health Care Providers THE
19 REGENTS OF THE UNIVERSITY OF
   CALIFORNIA INCLUDING UCLA,
20 UCI, UCSD, UCSF, UC DAVIS
21 MEDICAL CENTERS, including
   administrators and physicians
22 ANDREW VIVAS, M.D., ELIZABETH
23 LORDE, M.D., SHARON HAME,
   M.D., OLCAY AKSOY, M.D., ISAAC
24 YANG, M.D., LEE TAN, M.D.,
25 CEDARS-SINAI MEDICAL CENTER
26 including administrators and
   physicians ANCA M. BARBU, M.D.,
27 KEITH L. BLACK, M.D., CAROL
28

DOBASHI, ROBERT C. KLAPPER, M.D., FRANTZ R. LEREBOURS, M.D., CAROL A LIN, M.D., THOMAS M. PRISELAC, MARK S. VRAHAS, M.D., STANFORD HEALTH CARE, including physician and administrators SOPHIA LOO, CHRISTINE BULNES, CORRINA ZYGOURAKIS, M.D.; UNIVERSITY OF SOUTHERN CALIFORNIA KECK HOSPITAL, including physician THOMAS CHEN, M.D., SUTTER HEALTH including physicians and administrators GEORGE PICETTI, M.D., RUDOLPH SCHROT, M.D.; DIGNITY HEALTH, SAINT BERNARDINE MEDICAL CENTER; and DOES ONE through ONE HUNDRED inclusive,

Defendants.

**Jurisdiction and Venue:**

1.      This Court has jurisdiction over the Governmental Code section 11135 and California Code of Regulations, title 2, section 11154(i)(2) claims pursuant to Government Code section 11139; over the request for a Writ of Mandate under Code of Civil Procedure section 1085; and to grant injunctive and declaratory relief under Government Code section 11135,

Article VI, Section 10 of the California Constitution, and Code of Civil Procedure sections 410.10, 525, 526, 526a, and 1060, as well as, California's Civil Code section 51, The Unruh Act, and Government Code section 11135, as well as the federal 42 U.S.C. 12101, et seq, and,  42 U.S.C. 12181 et seq, the American with Disabilities Act (ADA).

2.      Venue in U.S. Federal Court is appropriate under Code of Civil Procedure sections 395(a) and 401(a) in that the Defendants are located in and/or do business in Alameda, Los Angeles, Sacramento, San Diego and San Francisco Counties and the Attorney General has offices throughout California.

**PARTIES**

3.      Plaintiff MICHAEL DEUSCHEL (Plaintiff) was at all times relevant hereto an individual residing in the Alameda, Los Angeles, Sacramento, San Diego and San Francisco Counties, California, enrolled in Medi-Cal, a state and federally funded public medical service coverage plan as an Adaptive person with disabilities seeking medical services from California Medical Providers. He required twelve surgeries, which Defendants have delayed and denied for the past ten years. Recently, about May 16, 2022, UCSF Electrophysiologist Dr. Marcus kindly performed heart surgery and implanted a pacer in Plaintiff. Subsequently, Plaintiff regained the strength to fight the medical providers who have and

continue to harm him by denying eleven surgeries. After years of exhausting administrative remedy, Plaintiff, once again, turns to the Courts for relief.

**Defendants:  Medical Provider, including Medical Centers, Physicians and Administrators:**

**a.  UC REGENTS UCLA, UCI, UCSD, UCD, UCSF Medical Centers:**

4.     The Regents is a governing Board of the University of California, a state university system in California. The Board of Regents has 26 voting members, the majority of whom are appointed by the Governor of California to serve 12-year terms. They control the University of California Medical Centers. UC Regents Medical Centers subscribes to Medi-Cal to treat Medi-Cal Enrollees and accepts Medi-Cal funds.

5.     Defendants UC Regents Medical Centers are and at all times relevant were public entities and corporations duly organized and existing under and by virtue of the laws of the State of California, with their headquarters in the Oakland, Alameda County. It is a professional medical corporation engaged in the business of acting as a provider of medical services. UC Regents Medical Centers are one of the largest medical providers in California.

6.     Andrew Vivas, M.D., Elizabeth Lorde, M.D., Alcoy Aksoy, M.D., Sharon Hame, M.D., Lee Tan, M.D., are physicians employed by the UC Regents who wrongfully discriminated against Plaintiff and obstructed his access to appropriate and timely medical services including surgeries.

**b.  Cedars-Sinai Medical Center:**

7.     Defendant Cedars-Sinai Medical Center is and was at all times relevant was, a public entity and corporation duly organized and existing

under and by virtue of the laws of the State of California. Cedars Sinai Medical Center is a nonprofit tertiary 886-bed hospital and multispecialty academic health science center located in Los Angeles, California. Cedars-Sinai subscribes to Medi-Cal to treat Medi-Cal Enrollees and accepts Medi-Cal funds. Mr. Thomas M. Priselac is its CEO. Carol Dobashi is the clinic manager for the Orthopedic Department, Anca M. Barbu, M.D., Keith L. Black, M.D., Robert C. Klapper, M.D., Frantz R. Lerebours, M.D., Carol A Lin, M.D., Mark S. Vrahas, M.D., are physicians associated or contracted with or employed by Cedars-Sinai.

### c. Stanford Health Care:

8.     Defendant Stanford Health Care is Stanford University's Medical Center and is and at all times relevant was, a public entity and corporation duly organized and existing under and by virtue of the laws of the State of California. Stanford University is a private research university located in the census-designated place of Stanford, California.

9.     Stanford Health Care is a medical complex which includes Stanford Health Care and Stanford Children's Health. It is consistently ranked as one of the best hospitals in the United States and serves as a teaching hospital for the Stanford University School of Medicine. In 2020–21, it was ranked by the US News as the 4th-best hospital in California (behind ULCA, Cedars Sinai and UCSF, respectively) and 13th-best in the country. Stanford Health Care subscribes to Medi-Cal to treat Medi-Cal Enrollees and accepts Medi-Cal funds.

10.     Corrina Zygourakis, M.D. is a physician employed by Stanford Health Care.

### d. Sutter Health:

11.     Defendant Sutter Health is and was at all times relevant was, a public entity and corporation duly organized and existing under and by virtue of the laws of the State of California. Sutter Health, founded in 1921 as a response to the 1918 flu pandemic, is a not-for-profit integrated health delivery system headquartered in Sacramento, California. It operates 24 acute care hospitals and over 200 clinics in Northern California. Sutter Health subscribes to Medi-Cal to treat Medi-Cal Enrollees and accepts Medi-Cal funds. George Picetti, M.D. and Rudolph Schrot, M.D., are physicians employed by Sutter Health.

### e.  University of Southern California, Keck Medical Center

12.     Defendants University of Southern California (USC) Keck Medical Center is and was at all times relevant a private research university in Los Angeles, California.

13.     The Keck Hospital of USC is a private 401–licensed bed teaching hospital of the University of Southern California (USC). The hospital is part of the USC Keck School of Medicine, it is located on the USC Health Sciences Campus, which is adjacent to the Los Angeles County+USC Medical Center, east of downtown Los Angeles.

14.     In 2019, the Keck Hospital was ranked by U.S. News & World Report as the fifth on the West Coast after the UCLA Ronald Reagan Medical Center, Cedars-Sinai Medical Center, UCSF Medical Center, and Stanford University Medical Center. Keck Hospital of USC subscribes to Medi-Cal to treat Medi-Cal Enrollees and accepts Medi-Cal funds. Thomas Chen, M.D. is a physician employed by USC Keck Medical Center.

### f.  Dignity Health Saint Bernardine Hospital:

15.     Saint Bernardine Medical Center in San Bernardino, California, is a general medicine and surgical facility. It is a member of the Dignity

Health Medical Foundation. Dignity Health is a Catholic-based not-for-profit public-benefit corporation that operates hospitals in three states.  It is the fifth largest hospital system in the nation and the largest not-for-profit hospital provider in California. In February 2019, Dignity Health merged with Catholic Health Initiatives, becoming CommonSpirit Health. It is headquartered in San Francisco, CA. Saint Bernardine subscribes to Medi-Cal to treat Medi-Cal Enrollees and accepts Medi-Cal funds.

**Does:**

16.    The true names and capacities, where individual, corporate, associate or otherwise, of defendants named herein as Does 1 through 100, inclusive, are unknown to Plaintiff, who therefore sues said Defendants by such fictitious names. Each of the defendants named herein as a Doe is responsible in some manner for the events and happenings hereinafter referred to, and some of Plaintiff's damages as herein alleged were proximately caused by such Defendants. Plaintiff will seek leave to amend this complaint to show said Defendants' true names and capacities when the same have been ascertained.

17.    At all times mentioned herein, each of the Defendants was the agent or employee or each other Defendants, or an independent contractor, or joint venturer, and in doing the things herein alleged, each such defendant was acting within the scope of said agency and/or employment and with the permission and consent of each other Defendant.

18.    Plaintiff alleges that there exists, and at all times mentioned existed, a unity of interest between Medical Provider Defendants, Managed Care Plan Defendants and State Agency Defendants and each of them are and at all times herein mentioned were, mutual instruments and conduit

through which Defendants, and all of them, carried on their fraudulent injurious business in the State of California.

19.    Adherence to the fiction of the separate existence of the Defendants and all of them, would permit an abuse of the corporate privilege and publicly formed county charters authorizing defendants' existence and would promote injustice by protecting Defendants from prosecution for the wrongful acts committed by them under their individual names.

20.    Furthermore, Plaintiff is informed and believes that Defendants in a joint venture to provide the services that are the subject of this lawsuit, were so intimately intertwined that the policies and practices that were utilized in connection with the requests for benefits that are the subject of this lawsuit were equally those of all Defendants.

### FACTS COMMON TO ALL CAUSES OF ACTIONS:
### MEDICAL PROVIDERS' STATEMENT OF FACTS:

21.    Medical centers, physicians and administrators deprive Plaintiff of appropriate and timely medical services, discriminate and retaliate against him. If only one medical provider deprived Plaintiff of his M-C benefits, theoretically he can transfer to another. Yet, each Medical Center Plaintiff solicited for appropriate and timely medical services including surgeries denied him and thereby discrimination against him.

22.    The similarity and consistency of the tactics used by eleven prominent Medical Centers demonstrates a vast, concerted agenda. The exhausting 10-year search and detrimental denials of complex surgeries, injured Plaintiff and left him with no alternative. This way, the indifferent Medical Providers join the CMOs and State Agencies, to create a state-

wide, inhuman system of deprivation against M-C Enrollees with dire, disparate impact upon Plaintiff, an Adaptive person with disabilities.

23.     Medical Providers' tactics of deprivation include: (1) Refusals to accept Medi-Cal though the Medical Center is contracted with Medi-Cal; (2) Delays in scheduling, rescheduling or fulfilling follow-through appointments; (3) Primary Physicians refuse to refer Plaintiff to Specialty Clinics; (4) Specialty s' denial of medical services; (5) False Denials of diagnostic findings; (6) Manipulation of medical protocol; (7) Manipulation of Medi-Cal's Treatment Authorization Requests, Deferrals and requests for additional medical information; (8) Use of non-accommodating equipment and/or failure to accommodate Plaintiff; (9) Denial of surgery/treatment; (10) Abandonment; (11) Denial of Grievance procedures; (12) Harassment; (13) Assaults.

24.     Since 2013, UC Regents Medical Centers' specialists refuted Plaintiff's need for medical services by denying radiological findings, generating false medical reports, manipulating medical protocol; deceitful administrative claims and by generating insufficient or no Medi-Cal Treatment Authorization Requests (TAR).

## UCLA

### i. Cardiology and Electrophysiology Depts.:

25.     UCLA Cardiology and Electrophysiology (EP) discriminated against Plaintiff, manipulated medical protocol and denied his cardiological disorder in order to avoid provision/deprive him of the necessary heart surgery. Yet, they financially capitalized upon his status and inflicted years of anguish and pain. By ordering numerous expensive tests and imaging but misrepresenting the results to deny his true surgical need, they committed fraud and abused him, repeatedly.

26.    On about July 16, 2020, UCLA Cardiology administered a contrast dye Definity to Plaintiff during a Cardiogram. He suffered a severe adverse reaction. Dr. Aksoy advised him to walk to the ED as the EMS would take too long. Alas, the ED in-take staff dismissed his urgent need for care and instead insisted he was suffering a chronic headache. He left.

27.    Thrice, UC Cardiologists provided false surgical clearances that put Plaintiff in harm's way.

28.    First, about May 2020, UCLA Cardiology Dr. Aksoy cleared Plaintiff for orthopedic joint surgeries. Therefore, Plaintiff traveled more than four hundred miles to Mammoth Orthopedic Institute, the only provider in the last nine years willing to accept Medi-Cal to perform the joint surgeries. Yet, upon arrival Plaintiff suffered heart failure.

29.    He had to return to UCLA due to the heart problems.

30.    About June 24, 2020, Plaintiff met UCLA Electrophysiologist Houman Khakpour, M.D. Dr. Khakpour prescribed either heart surgery or additional collection of data through an internal, surgically installed "Loop Recorder." To avoid heart surgery, Plaintiff agreed to the loop recorder—not knowing that a simple treadmill test, later ordered by UCSF, could provide the necessary medical information to make an accurate diagnosis.

31.    About September 15, 2020, UCLA Electrophysiology Dr. Khakpour installed an expensive Loop Recorder valued at about $20,000 but failed to calibrate it in accordance with Plaintiff's medical needs. Subsequent UCLA physicians refused to adjust it, too, rendering it useless to Plaintiff.

32.    One week later, about September 23, 2020, Plaintiff returned to UCLA Medical Center for a post-operative follow-up appointment.

Plaintiff called Dr. Khakpour's office from the lobby and informed his office staff that misguided Covid-19 staff in the lobby were denying him access and requested their assistance.

33.     Dr. Khakpour and his staff refused to assist Plaintiff and the UCLA police proceeded to assault and arrest Plaintiff. Dr. Khakpour subsequently abandoned Plaintiff.

34.     His actions and subsequent facts revealed the loop recorder was a fraudulent act.

35.     For his next surgical clearance, Plaintiff sought care at UCLA Cardiology, Santa Monica. There, Defendants discriminated against him and refused to accommodate him. Their Nuclear Testing equipment does not accommodate Adaptive persons with disabilities. They subsequently lied to Plaintiff about the proper accommodations available at Westwood Nuclear Testing Department. Through self-advocacy, Plaintiff subsequently obtained the Nuclear Stress Test from the kind, accommodating staff at UCLA Westwood Nuclear Medicine.

36.     December 16, 2021, in an attempt to clear Plaintiff for surgery, UCLA Cardiology Santa Monica Dr. Daneshvar kindly placed a same-day order for a CT at their Emergency Department.

37.     Alas, on December 16, 2021, UCLA Santa Monica Emergency Department failed to administer the proper pre-procedure questionnaire, failed to inform Plaintiff it would be a contrast enhanced CT and failed to provide appropriate pre-procedure prescriptions.

38.     Kaiser's similar malpractice led to the near-lethal Gadolinium Toxicity and the last thirteen years of living hell. Indeed, he has subsequently suffered adverse reactions to other types of contrast dyes, despite his vigilance, due to physicians' misrepresentations.

39.     At the very last minute, while Plaintiff was already in the CT tube, the staff stated they would administer iodine-based contrast dye. Plaintiff objected. The head Radiologist realized the error and stated, "Get him out of my CT."

40.     Subsequently, the ED physician harassed Plaintiff when he attempted to leave the dangerous situation. Plaintiff criticized her for putting him in harm's way due to his NSF and CKD disabilities that render him vulnerable to Contrast Induced Nephropathy (CIN).

41.     When Plaintiff returned to Dr. Daneshvar's office to inform him of the incident, Dr. Daneshvar wrongfully criticized Plaintiff and yelled at and mocked Plaintiff in a public hallway and in front of staff. Dr. Daneshvar explained that the ED physician slandered Plaintiff and preemptively informed Dr. Daneshvar that Plaintiff supposedly, "Lambasted," her.

42.     In fact, Plaintiff was protecting himself. Only at UCLA, is an Adaptive person with disabilities advocating for safety accused of lambasting by an egocentric ED physician.

43.     Second, Dr. Daneshvar cleared Plaintiff for surgery. Yet, December 20th, the thoracic spinal cord surgery was postponed because Plaintiff's heart was too weak.

44.     Subsequently, upon his return to Los Angeles, Dr. Daneshvar harassed Plaintiff and allowed their relationship to deteriorate.

45.     About February 3, 2022, UCLA Cardiac Devise Clinic, on instructions from Dr. Macias, refused to adjust Plaintiff's loop recorder to an appropriate range to record adverse cardiac events. Instead, they set the range at 30BPM well below Plaintiff's dysfunctional heart range, thereby causing the device to make no recordings/provide no data.

46.     About February 14, 2022, with apprehension from the police assault, six months earlier, Plaintiff nervously returned to Dr. Aksoy for help. Though Dr. Aksoy recently admitted off the record that Plaintiff probably needed a pace maker, "All along," after the tread mill test, he lied to Plaintiff and stated, "You passed the test."

47.     In fact, Plaintiff failed it.

48.     Dr. Aksoy then harassed Plaintiff and growled, "What, you *want* a pace-maker?"

49.     Plaintiff responded, "I want an accurate diagnosis, then we'll discuss treatment." He also told Dr. Aksoy that he was shocked that he elected to end an eight-year relationship on such a horrible note and that Plaintiff would hold him accountable for his mistreatment.

50.     Third, UCLA Cardiology doubled down on their mistreatment and despite Plaintiff's well-expressed apprehension, Dr. Aksoy provided *a third false surgical clearance*, *once again placing Plaintiff in harm's way.*

*51.*     Plaintiff could no longer tolerate the abuse, on-going harassment and hostile environment and stopped advocating for Cardiac medical services at UCLA—which is what they wanted.

52.     UCSF EP Dr. Marcus and UCLA Pulmonologist Dr. Eshaghian ordered the tread mill test. In truth, the simpler, far less expensive tread mill test revealed the true heart disorder.

53.     About February 7, and March 10, 2022, UCLA Cardiology Stress Lab located in the Ronald Regan Hospital accommodated Plaintiff well, with respect and kindness. With a true interest in Plaintiff's well-being, they achieved test results that revealed his true heart disorder of chronotropic incompetence and sick sinus node syndrome.

54.     May 16, 2022, UCSF Electrophysiologist Dr. Marcus treated Plaintiff. He surgically installed a pacer implant—9 years after Plaintiff sought care for his heart at UCLA. During surgery, the fraudulent, useless $20,000 loop recorder was explanted and discarded.

### UCLA Emergency Department:

55.     For the last three years, and longer and continuing, UCLA Emergency Rooms have repeatedly denied Plaintiff necessary timely medical services and thereby violated MTALA and his state and federally ensured ADA Rights.

56.     About September 2015, UCLA ED denied Plaintiff treatment for his cranial infection by falsely denying his skull was infected.

57.     About 2018, UCLA ED refused to treat Plaintiff and denied him a CT of his head. The police advised the staff they were violating MTALA.

58.     About July 16, 2020, Plaintiff went to the UCLA Westwood ED after the Cardiology Definity adverse reaction, the in-take staff mocked him and insisted he was suffering a chronic headache. He left.

59.     At the end of his last visit at UCLA Westwood ED, about September 23, 2020 and September 30, 2020, after he waited for hours to be discharged, staff refused to remove the IV from his arm. When he left to go to UCLA Santa Monica ED to have it removed, maligned staff chased him down the public street, threatening him.

60.     Subsequently, the Sant Monica ED refused to remove the IV that was left in his arm from the UCLA Westwood ED incident of neglect, exacerbating the discrimination.

61.     Third, about December 16, 2021, UCLA Santa Monica ED's latest mistreatment regarding the CT imaging is detailed above.

62.     Soon thereafter, Plaintiff could no longer tolerate the abuse, on-going harassment and hostile environment and stopped advocating for Neurosurgery medical services from UCLA—which is what they wanted.

### UCLA Endocrinology/Gonda Diabetes Center:

63.     About August 8, 2018, Albert Shieh, M.D., refused Plaintiff any treatment for his Osteoporosis. Since, no physician would treat Plaintiff's Osteoporosis. Indeed, about a year earlier, UCLA Rheumatology submitted a TAR to Medi-Cal for treatment with Prolia for his Osteoporosis. Yet, after Medi-Cal authorized the treatment, UCLA Rheumatology and Endocrinology refused to administer it to Plaintiff. Yet, UCLA repeated the Bone Scan test to repeatedly confirm Plaintiff's Osteoporosis but continued to deny treatment, rendering the related expensive imaging and medical appointments as fraudulent.

64.     From August 2018 to September 2020, Plaintiff repeatedly pled for treatment but was denied. Plaintiff could no longer tolerate the abuse, on-going harassment and hostile environment and stopped advocating for Osteoporosis treatment from UCLA—which is what they wanted.

### UCLA Head & Neck Department and Physicians:

1.     For the last three years and longer and continuing, UCLA Head & Neck Surgery has repeatedly denied Plaintiff necessary medical services, including a revision surgery to correct their surgical errors.

2.     Previously, UCLA Dr. Mendelsohn mutilated Plaintiff's vocal cords and subsequently refused to revise them, exacerbating his disability and subsequently discriminated against Plaintiff by refusing to treat the iatrogenic injury he inflicted upon Plaintiff.

3.    About July 20, 2018 and August 15, 2018, UCLA Dr. Quinton Gopen diagnosed Superior Semi-Circular Canal Dehiscence (SSCD)

4.    About December 19, 2018, UCLA Dr. Gopen and Isaac Yang, M.D. denied Dr. Gopen's previous diagnosis of SSCD and therefore denied surgery then failed to further diagnose Plaintiff's disorders.

5.    Recently, UCLA Head & Neck staff committed fraud. They instructed Plaintiff to obtain pre-evaluation testing for an evaluation appointment.

6.    About February 3 and 11, 2022, the Head & Neck technicians performed the prerequisite tests including a hearing test and a VEMP test. Yet, upon completion of the testing, Head & Neck refused to schedule the promised evaluation appointment with a physician for Plaintiff.

7.    About May 2022, Plaintiff could no longer tolerate the abuse, on-going harassment and hostile environment and stopped advocating for Head and Neck medical services at UCLA—which is what they wanted.


**UCLA Neurosurgery:**

8.    For the last three years, and longer and continuing, UCLA Neurosurgery repeatedly denied Plaintiff necessary surgeries and thereby discriminated against him.

9.    About June 2018, UCLA Neurosurgery refused to surgically explant the defective, FDA recalled neurostimulator.

10.    On about September 18, 2019, Dr. Isaac Yang exercised a reprehensible level of mockery of Plaintiff. Plaintiff pled for surgery that Dr. Yang denied him and stated, "I am a human being and deserve to be treated as one. I need this surgery."

11.     Then, Dr. Yang laughed at Plaintiff in a maniacal manner each time he mocked, "I am human, too. I am human, too. I am human, too," as he denied Plaintiff revision cranioplasty surgery. His was a particularly cruel, unethical level of abuse and mockery.

12.     Plaintiff complained to the Clinic manager. She failed to assist Plaintiff. Soon thereafter, Plaintiff could no longer tolerate the abuse, on-going harassment and hostile environment and stopped advocating for Neurosurgery medical services from UCLA—which is what they wanted.

### UCLA's Office of Compliance:

13.     Though the Office of Compliance reached out to Plaintiff and kindly interviewed him and requested a complaint, after Pulmonology Clinic manger contacted them. Plaintiff submitted a complaint but the Office of Compliance failed to respond to Plaintiff.

### UCLA Ophthalmology:

14.     For the last three years, and longer and continuing, Ophthalmology discriminated against Plaintiff and manipulated their evaluation of an identified neuro-ophthalmological disorder and refused him timely medical services.

15.     2018, UCI Ophthalmology Dept. diagnosed Plaintiff with neuro-ophthalmological disorders requiring treatment and advised Plaintiff to seek care at UCLA.

16.     February 22, 2019, UCLA Ophthalmologist Benjamin I Graham confirmed UCI diagnoses and referred Plaintiff to the UCLA Stein Eye Center in Westwood.

17.     April 29, 2019, Laura Bonell, M.D. denied Plaintiff medical services to treat his diagnosed neuro-ophthalmological disorders.

18.    May through September 2019, Plaintiff revisited the administrative office and pled for medical services. Though the staff repeated promised him the Director would call him, Plaintiff never received any such call and ceased his pleas for help.

19.    Soon thereafter, Plaintiff could no longer tolerate the abuse, on-going harassment and hostile environment and stopped advocating for Ophthalmological medical services at UCLA—which is what they wanted.

### UCLA Orthopedic Department:

20.    For the last three years, and longer and continuing, UCLA Orthopedics discriminated against Plaintiff and refused any prescribed joint surgeries. These surgeries are not only medically necessary but the California Dept. of Social Services' Administrative Law Jude ordered them to be performed in October, October of 2013.

21.    Yet, about January 30, 2019 and July 11, 2019, Orthopedics physician Dr. Alexakis denied any shoulder, elbow or hip injuries.

22.    About July 19, 2019, October 11, 18 and 24, 2019, November 1, 2019, April 2020, August 6 and 27, 2020, Orthopedics PA Ms. Jheralyn Martin kindly evaluated Plaintiff and ordered imaging. Yet, Dr. Sharon Hame refused to see him, let alone provide surgical services. Yet, she is the chair of equity, diversity and inclusion. Yet, she discriminated against Plaintiff. They committed fraud when they charged Medi-Cal/Plaintiff for evaluations and imaging but denied surgeries. Instead, UCLA PA Jheralyn Martin advised Plaintiff it would be better for him to pursue surgeries elsewhere because UCLA and Dr. Hame will not accept Medi-Cal.

23.    Currently, on the UCLA Orthopedic website, Dr. Shame states, "I am extremely honored to help lead the Department of Orthopedics Surgery's efforts to foster an environment of equality, diversity, inclusion

and social justice." Her actions and inactions demonstrate a pronounced, unabashed hypocrisy and a vulgar personal policy of discrimination.

24.    Recently, about January 13, 2022, at the instruction of the urgent care physician Dr. Puneky, Dr. Baroni and the Clinic Manager, Reena, Plaintiff visited the Orthopedic Department. Dr. Baroni and the clinic manager Reena informed Plaintiff that they have seen many of their patients who are Medi-Cal Enrollees denied medical services.

25.    Alas, upon his visit, Orthopedic's evening Urgent Clinic staff stated she would search for a surgeon who accepts Medi-Cal and call Plaintiff and suggested, if he does not hear from her, he should return to the Clinic in a few days.

26.    Yet, when he tried to return, the clinical manager, Ms. Maria Chavez, met him in the hospital lobby, mocked him and stated in a hostile, discriminatory manner, "I know who you are; everyone knows who you are." When Plaintiff stated he believes her refusal to allow him access was discriminatory, she mocked him, "You've threatened us with that before," laughed at him and walked away, leaving him abandoned in the lobby.

27.    In contrast, about a later month, Plaintiff called the Orthopedic Surgery Dept., again, at the Primary Care's bequest. Staff referenced a, "Matrix," and listed surgeons who were accepting Medi-Cal, and, *schedule Plaintiff* for two appointments for shoulders and spine—according to the staff, they did not have an hip surgeon who would accept Medi-Cal.

28.    About April 28, 2022, Plaintiff finally met the orthopedic shoulder surgeon, UCLA Robert Andrew, M.D. Due to his unaddressed spinal injuries, Plaintiff could not position himself as necessary for adequate shoulder X-Rays. Dr. Andrew stated he could not assist Plaintiff until he received the two outstanding spine surgeries.

29.    For about more than eight years, UCLA has denied Plaintiff any orthopedic surgery, despite the CDSS October 2013 order for shoulder and hip surgeries and despite the extensive imaging demonstrating the need for surgeries and despite prescription of surgery by other physicians.

30.    Soon thereafter, Plaintiff could no longer tolerate the abuse, on-going harassment and hostile environment and stopped advocating for Orthopedic medical services at UCLA—which is what they wanted.

**UCLA Pain Management:**

31.    For the last three years, and longer and continuing, UCLA Pain Management refused to treat Plaintiff or provide relief from the pain from eleven untreated major injuries.

32.    Recently, UCLA Dr. David Chen referred Plaintiff to UCLA PM for post-surgical pain.

33.    February 9, 2022, UCLA Pain Management Dr. Ing, stated that, "I have nothing to offer you."

34.    For an Adaptive person suffering exacerbated disabilities and requiring surgeries including c-spine revision for iatrogenic kyphosis and a misplaced pedicle screw; thoracic Arachnoid Web and spinal cord deterioration surgery; six joint surgeries including bilateral shoulder, elbow and hip surgeries; a spinal cord stimulator replacement surgery and bunion surgery, not to mention symptoms of Gadolinium Toxicity, his claim was absurd and discriminatory.

35.    Even his clinic manager agreed that Plaintiff cannot be abandoned or marginalized in this manner. She promised to advocate for him. Alas, when he returned a week later, she refused to tell him the results of her supposed advocacy. He was thereby denied care.

36.     Soon thereafter, Plaintiff could no longer tolerate the abuse, on-going harassment and hostile environment and stopped advocating for pain management medical services at UCLA—which is what they wanted

**UCLA Patient Experiences (Grievance Office):**

37.     For several years, Patient Experiences wrongfully dismissed Plaintiff and did not advocate for him to received denied medical services.

38.     About August 5 and 10, 2020, after Plaintiff complained to Patient Experiences for their failure to accommodate him as an Adaptive person with disabilities, they retaliated against him and refused to accept future complaints for denial of medical services and mistreatment.

39.     By about August 14, 2020, Patient Experience administrator Marianne Rowan-Braun reneged and failed to meet with Plaintiff as agreed. Their exclusion is discriminatory and retaliatory against Plaintiff for complaining about ability-based discrimination and wrongful denial of surgeries. As they stated, their exclusion is on-going, continuing every day, until further notice. It also undermines one of the most important pillars of any medical center: Without mutually respectful communication and just conflict resolution and due to their marginalization and exclusion of the aggrieved Plaintiff, UCLA devolved to a discriminatory state agency.

40.     UCLA Patient Experiences and UCLA President Johnese Spisso refused to meet Plaintiff despite his numerous pleas. They obstructed his rights to file grievances and thereby banished him to the heap of undesirables, cast from their elitist medical center—all because he is disabled and poor. Theirs is a hateful exercise of power. They keep Plaintiff disabled to serve their greed. Soon thereafter, Plaintiff could no longer tolerate the abuse, on-going harassment and hostile environment

and stopped seeking Patient advocacy and mediation services at UCLA—which is what they wanted.

### UCLA Police:

41. About September 23, 2020, UCLA Police wrongfully discriminated against, assaulted, battered and arrested and injured Plaintiff when he tried to attend his post-surgical EP appointment.

42. UCLA staff at a Covid-19 table in the building's lobby lied and falsely complained Plaintiff would not wear a mask. Plaintiff asked for a face shield but they refused to provide one. Plaintiff called the police.

43. If UCLA falsely asserts his face mask is insufficient—something that was never suggested prior to the assault—they are lawfully obligated to accommodate him and provide a face-shield. Prior to police arrival, Plaintiff asked for one and staff refused to provide one.

44. Yet, a responding police officer pressed upon his injured shoulder until Plaintiff reacted in pain then several officers tackled him to the ground and knelt on his injured neck while they kicked him in his groin.

45. Plaintiff cried out, "I can't breathe," but they laughed, "It will be over soon." The lead officer falsely declared, "He is reaching for your gun."

46. Plaintiff denied his absurd allegation and threat to his life as he was pinned to the ground under several police officers.

47. In fact, as an Adaptive Person with disabilities, suffering severe iatrogenic cervical spine kyphosis, face masks do not remain in position and slip down as he walks on his crutches. As a person dependent upon crutches, he cannot readily adjust his mask when it slips down. When he speaks, face masks slip down his face. When he

approached the Covid-19 table and answered their questions, it had slipped down.

48.     They thereby discriminated against him and instigated the assault and false arrest. Likewise, due to the untreated restricted breathing and sinus bradycardia/chronotropic incompetence heart disabilities, he was legally exempt from wearing a mask but wore one out of courtesy and concern for others.

49.     At the time of the assault, Plaintiff desperately needed cervical spine, *and*, thoracic spinal cord surgery, six joint surgeries, neurosurgery, heart surgery, bunion surgery and suffered restricted breathing and heart impairment. Yet, the police knelt on his neck and back while they repeatedly kicked him in his testicles and lied that he reached for their, "Gun," while UCLA staff filmed the assault and celebrated the abuse.

### UCLA Primary Care Physicians:

50.     Medi-Cal claims Primary Care Physicians are designated as M-C Enrollees' "Advocates." Yet, UCLA Primary Care Providers (PCPs) routinely cowered from their responsibilities to accommodate Plaintiff and to advance his surgical needs. Dr. Goldstein and Dr. Schoenbrun made false promises to accommodate him, but in the privacy of their exam rooms, refused to advocate let alone contest specialty departments' refusal to treat Plaintiff.

51.     About March 25, 2021 and April 29, 2021, Dr. Goldstein perpetrated the more absurd denial. He refused to read Plaintiff's medical records but insisted, "I don't know if you need the surgeries." Plaintiff left his non-existent service.

52.     Dr. Schoenbrun simply refused to make referrals on his behalf. Instead, she complained to him about the inordinate number of hours she

had spent treating Covid patients, presumably to insult Plaintiff for thinking his medical needs significant, in comparison. Plaintiff left her non-existent service.

53.    After months of promising to advocate for him, Dr. Baroni simply refused to advocate for Plaintiff to receive twelve surgeries but offered to perform an annual physical exam for him. Likewise, both she and clinic manager Reena repeatedly shared information and opinions that others including children enrolled in Medi-Cal are being unjustly denied medical services. Plaintiff begged them to introduce him to the Department manager Dr. Cursio and to escalate their advocacy efforts. When they refused, Plaintiff left Dr. Baroni's non-existent service.

54.    Soon thereafter, Plaintiff could no longer tolerate the abuse, on-going harassment and hostile environment and stopped advocating for Primary Care medical services at UCLA—which is what they wanted.

### UCLA Pulmonary Function Lab:

55.    The Pulmonary Function Lab discriminated against Plaintiff, twice. Two years ago, he informed the Lab's clinic manager, Robert, of his original encounter and asked him to resolve the discriminatory problem. He even visited the lab prior to his recent testing to advise the staff of his ability-based physical restrictions. They assured him they would accommodate him. Theirs was a false assurance.

56.    The Lab equipment does not accommodate kyphotic patients. Instead, its mouth-piece arm does not pivot. So only those who can sit erect can utilize the equipment and receive accurate medical test results.

57.    This is absurd for several reasons including the fact that equipment that incorporates a pivotable mouth-piece arm exists and UCLA

once had such equipment but replaced it with the new, non-accommodating equipment.

58.     Secondly, Plaintiff is kyphotic—though his is iatrogenic—and as his pulmonologist has repeatedly stated, the kyphosis aggravates his restricted breathing. Hence, his segment of the population of pulmonology patients with kyphosis are knowingly excluded from integral pulmonary function testing which is an absurd act of blatant discrimination.

59.     Instead, on about March 7, 2022, UCLA Pulmonary Function Lab staff mocked and criticized Plaintiff. In the past and recently, they falsely alleged that he was insincere in his efforts to breathe into the pulmonary function testing equipment. They made false, injurious remarks not only directly to him at the time of the testing and yelled at him to, "Try harder," and, "Do better," they recorded their false, hateful allegations of his supposed insincerity in their reports.

60.     Theirs is a classically hateful act of attack and retaliation. Rather than accommodate Plaintiff, they falsely blamed him, humiliated him and lied about him and his performance in medical records, 21 years after the ADA was passed as Federal law.

61.     Recently, about July 29, 2022, during a twenty-eight minute phone discussion, the Lab's staff failed to accommodate Plaintiff. When Plaintiff explained that their refusal to accommodate him was discriminatory, the clinic Manager, Robert, falsely claimed Plaintiff was trying to "Rial," him. He and most UCLA staff exercise a solipsistic tactic of reversing their discrimination against the victim and falsely insisting the victim is the antagonist of their egocentric world when s/he demands they cease their discriminatory actions and inactions and accommodate him.

Robert's and many other UCLA staff and physicians' malicious reversals are injurious to Plaintiff, not to mention the denial of medical services.

62.    It must be noted, for a nearly identical treadmill or stationary bicycle testing, the Cardiac Stress Test lab kindly and professionally accommodated Plaintiff by simply bracing him during the testing. Therefore, the hateful denial of similar services at the Pulmonology Testing Lab is blatantly discriminatory.

63.    Soon thereafter, Plaintiff could no longer tolerate the abuse, on-going harassment and hostile environment and stopped advocating for Pulmonary Testing medical services at UCLA—which is what they wanted.

**UCLA Radiology:**

64.    For about the last three years, and longer and continuing, UCLA Radiology has discriminated against Plaintiff. When Plaintiff complained about their discrimination, the Radiology Administrators and physicians retaliated against him for his complaints. They repeatedly refused him critical spinal imaging to evaluate the spinal cord injury and thereby discriminated against him and obstructed his access to appropriate and timely medical services, including surgeries.

65.    About October 2021, Radiology denied Plaintiff's order for a CT Arthrogram of his spine.

66.    About December 2021, Radiology misrepresented and denied the severity of Plaintiff's injuries requiring surgeries, namely his right foot bunion, and thereby misled physicians relying upon Radiology's diagnosis to prescribe appropriate and timely medical services, including surgeries.

**UCLA School of Dentistry:**

67.    For a substantial period of time, UCLA School of Dentistry postponed Plaintiff's Dental appointments due to Covid-19 protocol.

68.     About February 2, 2021, UCLA School of Dentistry discriminated against Plaintiff, an Adaptive Person with Disabilities. After they cleared and approved Plaintiff to be a patient, and after the inordinately long delay due to Covid-19, UCLA School of Dentistry denied him dental services and refused treatment. They alleged it was because he does not have a physical address; they rejected his post-office address.

69.     Plaintiff does not have a physical address directly because of his unyielding status as an Adaptive person with exacerbated disabilities and severe medical incapacitation because Defendants have and continue to deny him critical surgeries and dental treatment including oral surgeries to repair broken teeth—several teeth were cracked and damaged during the February 26, 2020 surgical cervical spine mutilation.

70.     Likewise, theirs is but a thinly veiled attempt to conceal their animus and acts of discrimination against Plaintiff, an Adaptive person with disabilities enrolled in Medi-Cal, by denying him appropriate and timely dental medical services due to his disabilities and enrollment in Medi-Cal by "blaming him" for his housing status and indigency.

71.     For several months, Plaintiff sought remedy to no avail. Soon thereafter, Plaintiff could no longer tolerate the abuse, on-going harassment and hostile environment and stopped advocating for dental medical services at UCLA—which is what they wanted.

**UCLA Spine Department and Physicians:**

72.     For about the last three years and longer and continuing, UCLA Spine Department and surgeons have refused Plaintiff critical cervical spine and thoracic spinal cord surgeries. They have made false promises to treat him then subsequently abandoned him.

73.   About December 14, 2018, UCLA Luke Macyszyn denied Plaintiff's had a thoracic spinal cord disorder and denied him critical thoracic spinal cord surgery to address the Arachnoid Web of the Spine.

74.   About November 13, 2020, after the UCSD cervical mutilation, Luke Macyszyn, M.D., denied Plaintiff's pronounced cervical spine iatrogenic injuries and refused him urgently needed revision cervical spine surgery and Thoracic Arachnoid Web spinal cord surgeries.

75.   Instead, Dr. Macyszyn falsely insisted Plaintiff simply needed physical therapy.

76.   About December 28, 2020, and January 25, 2021, Andrew Vivas, M.D., evaluated Plaintiff.

77.   January 29, 2021, Plaintiff completed Dr. Vivas' ordered Pre-operative Anesthesia Evaluation and obtained surgical clearances from UCLA Cardiology and Pulmonology (albeit, Cardiology's clearance would later prove to be false.)

78.   February 22, 2021, was the last date Plaintiff saw Dr. Vivas and pled for surgery.

79.   About March 4, 2021, the clinical team for orthopedic spine surgeon Elizabeth Lord, M.D., called Plaintiff and offered to evaluate his cervical spine. Plaintiff clearly asked if Dr. Lord was considering to perform the surgery and her team, explicitly stated, "No, only an evaluation." Plaintiff explained that he has been repeatedly evaluated, about four or five times, and did not, "Want to drag [them] into the current conflict," and declined.

80.   About March 12, 2021, Plaintiff submitted a written complaint with the Spine Center's clinic manager complaining that Andrew Vivas, M.D., manipulated Plaintiff, promised he would not abandon him, then

denied him urgently needed spine surgeries, and abandoned him. His actions were cruel, fraudulent, unethical and discriminatory. He charged Plaintiff for the discriminatory medical appointments and evaluations which he manipulated to misrepresent Plaintiff's true surgical needs and thereby committed fraud.

81.    About April 2022, UCLA notified Plaintiff that UCLA now accepts Medi-Cal and they made an appointment for him to see UCLA orthopedic spine surgeon Dr. Elizabeth Lorde for April 29, 2022. Yet, Dr. Lorde, who is appointed as the orthopedic spine surgeon who accepts Medi-Cal, refused and canceled Plaintiff's appointment without warning—neither she or her staff called Plaintiff to explain, either prior to or after cancellation.

82.    As per the Clinic manager, Celso, she refused to see Plaintiff because of his past interaction with Dr. Vivas. She thereby 'blamed the victim," of ability-based and Medi-Cal discrimination and perpetuated it and further harmed Plaintiff with her denial of care and surgical services.

83.    Dr. Lord's explicit and willful actions demonstrate the worst of community-based discrimination: Blame the Victim and retaliate against him for having the nerve to complain about ability-based discrimination, physician abandonment and denial of medical services. She had no legitimate justification for blaming Plaintiff for Dr. Vivas' preceding actions but for Plaintiff's complaints thereof, which renders her actions retaliatory.

84.    Nevertheless, Dr. Lord perpetuated the cruelty and as the third spine surgeon, she denied Plaintiff urgently needed revision cervical surgery in order to protect her colleagues and conceal their discrimination. Ironically, she thereby further exposed it and perpetuated it. Her supposed right to select patients does not include hateful motives to discriminate

against Plaintiff due to his disabilities and assist and conceal Dr. Macyszyn and Dr. Vivas' previous discrimination, especially when she never met Plaintiff. This is how discrimination is intentionally institutionalized and how Plaintiff was excluded from UCLA's Spine Center.

85.    On August 6, 2022, Plaintiff discovered Defendants' purported medical report addendum, added to Dr. Vivas' February 22, 2022, medical report. On an undesignated date, but apparently after Plaintiff submitted his March complaint, and after the Orthopedic Dept.'s April invitation for Plaintiff to schedule with Dr. Lord, Andrew Vivas, M.D., produced a slanderous, defaming report, painting himself in an angelic manner and presenting numerous false statements and characterizations about Plaintiff in order to characterize him as a mentally ill and problematic person.

86.    In accordance with California Civil Code section 48a, about August 13, 2022, Plaintiff demanded Defendants cease and desist their defamation and libel per se. Their false report constitutes defamation and libel per se and placed Plaintiff in a false light and was made with malice or reckless disregard whereby Defendants harmed Plaintiff.

87.    Herein, Plaintiff will reveal Defendants discriminatory, unprofessional animus by demonstrating (1) the falsity of their ad hominin attack; (2) their misrepresentation of his actions and history; (3) their manipulation of medical protocol; (4) their ability-based discrimination.

88.    Plaintiff's March 10, 2021, letter to UCLA Spine Center's clinic manager memorialized his past concerns. That letter and this complaint can readily be compared to Defendants' slanderous purported medical report to ascertain the facts. Unfortunately, Plaintiff did not know about

Defendants slanderous purported report until recently. If he had, he certainly would have cited it in his March 2021 complaint. Defendants' injury to him extends to the present and continues. The aggregate impact of their actions has devastated him. Their vindictive misuse of medical record protocol sabotaged his chance of obtaining the two spine surgeries elsewhere.

**Defendants' slanderous ad hominine attack:**

89.    Defendants misused the term "Conspiracy," to stigmatize Plaintiff as mentally unstable and in an attempt to undermine his veracity. For the recent past several years, to call or imply a person is a "Conspiracist," has become a highly charged and negative characterization both as an independent charge and through association. Their false charge is often associated with white supremacists and other racist political groups, some of whom have committed murder, as well as political groups such as QAnon, who tout conspiracy theories of absurd nature and proportions.

90.    Though the damage has already been done to Plaintiff from the time Defendants published the report, he refutes it herein. Either Defendants are of low intelligence which one would doubt due to their academic and professional accomplishments, or they knowingly made slanderous allegations by intentionally manipulating the term, "Conspiracy.

91.    For Defendants to allege Plaintiff espoused conspiracy theories, he would have to allege that a *covert*, powerful individual or organization *secretly* wields an undue degree of influence upon a larger economic, political or social context, with detrimental impact upon the alleged conspiracist, me.

92.     Yet, here, for several years, Plaintiff has *openly* stated what many physicians have confirmed with him. Namely, the *public and relevant* governmental agencies, namely the State of California's Dept of Health and Human Services Agency (CHHSA), Dept. of Health Care Services (DHCS) and Dept of Social Services' (CDSS), unlawful actions and inactions have led to a reduced reimbursement rate (RRR) that Medi-Cal pays physicians, that in turn undermines the purpose of the Med-Cal program and compels physicians to decline Medi-Cal Enrollees.

93.     A reasonable person would believe physicians would support a campaign to raise Medi-Cal's abysmally low RRR as it would benefit them and more importantly the 13 million vulnerable Medi-Cal Enrollees who cannot obtain appropriate and timely medical care.

94.     Indeed, numerous UCLA physicians have confirmed this dire situation. In fact, UC physicians published editorials decrying the UC Regents propensity to deny Medi-Cal Enrollees. Numerous substantial LA Times articles by Mr. Jack Nolan have reported Medi-Cal Enrollees are too often denied medical services and that some die while waiting for treatment. Oversight reports have lodged similar complaints. There has been and currently exists significant litigation on the matter. Plaintiff and others are desperately attempting to address this humanitarian crisis. Yet, according to Defendants, Plaintiff is a mentally unhealthy Conspiracist for protesting the fraudulent Medi-Cal program in which he is enrolled.

95.     Defendants' slanderous actions reveal one of the most problematic aspects of medical records when misused by physicians: They are unilateral presentations of bilateral interactions that are presumed accurate due to the trust that the patient and public alike invest in physicians. Alas, here, by Defendants' actions, decimated that trust.

96.    Defendants' slanderous allegation of "Conspiracy," is conceptually, semantically and personally false but has done its intended damage by instilling doubt in other physicians about Plaintiff's mental health, motives and political/social associations and actions.

**Defendants intentionally manipulated the history/temporal sequence of events of Plaintiff's arduous medical journey and pleas for spine surgeries in order to present a negative impression of him and place him in false light.**

97.    About December 28, 2020, during Plaintiff's first appointment with Andrew Vivas, M.D., the physician promised Plaintiff swift consideration for Arachnoid Web of the Spine (AWS) surgery because his status was urgent. Yet, the physician's 60-day delay was not swift and his discriminatory abandonment was devastating.

98.    Well after the fact-based diagnosis of AWS was well established, suddenly, about February 3, 2021, and contrary to his private statements to Plaintiff, Andrew Vivas, M.D., alleged the thoracic disorder became one of supposedly, "Unknown ideology."

99.    Any patient-victim would be understandably overwhelmed and aggrieved by the cervical mutilation performed by UCSD Ciacci and Martin on February 26, 2020—after they promised Plaintiff Thoracic AWS surgery. Andrew Vivas, M.D. even made several sympathetic comments to that effect.  The severe iatrogenic injuries—cervical mutilation and neglected thoracic AWS—are literally killing Plaintiff, compelling him to seek spine surgeries anywhere possible.

100.    Another of Defendants' prominent and critical deceptions concerns the necessary cervical spine revision surgery. Andrew Vivas,

M.D., wrote his report to make it appear as if from the start he was trying to provide cervical spine surgery, not thoracic surgery.

101.   Yet, Plaintiff sought help from Alexander Richter, M.D., an orthopedic spine surgeon in Orange County, with whom he had a standing medical relationship. In fact, Dr. Richter helped Plaintiff to search for a neurosurgeon to address his Thoracic Arachnoid Web.

102.   So when Plaintiff was mauled by UCSD Ciacci and Martin, he desperately sought help from Dr. Richter. He hopefully told Richter about Andrew Vivas, M.D., and Richter scheduled c-spine revision surgery for him, and only cervical surgery, as he cannot address the neurological injury to the spinal cord, as they believed Vivas would perform it soon after the revision c-spine surgery.

103.   Plaintiff thoroughly discussed these facts with Andrew Vivas, M.D. during their first appointment. Vivas responded, "He [Richter] sounds like a good man."

104.   On about January 25, 2021, during Plaintiff's second appointment with Andrew Vivas, M.D., he sought an explanation for the lack of communication and passage of one month without scheduling surgery. Vivas apologized to Plaintiff and explained he consulted Columbia University, where he completed your fellowship.

105.   Andrew Vivas, M.D., informed Plaintiff that Columbia wanted biopsy samples to test for Gadolinium Toxicity. Plaintiff never made the request but was grateful that a medical provider was interested in his past diagnosis and wanting to help him even though thirteen (13) years after it was administered, it was unlikely residue Gadolinium would be present, given its half-life. Yet, this increased his anticipation and hope. Also, Vivas confirmed the AWS diagnosis.

106.   Yet, Andrew Vivas, M.D., later manipulated these facts in order to conceal it was his request to obtain a bone sample for Columbia, not Plaintiff's request.

107.   Also, Columbia University is a well-known advocate for surgical redress for the AWS disorder. Hence, Andrew Vivas, M.D., could not have consulted them without presenting the facts and receiving confirmation of the AWS diagnosis and appropriate surgical intervention.

108.   Andrew Vivas, M.D., further explained and apologized that he had yet to present Plaintiff's case to UCLA's "Spinal Deformity Committee," because he, "Missed [it] last month."

109.   Plaintiff informed Andrew Vivas, M.D., about Dr. Richter's unfortunate withdrawal. The scheduled Orange County hospital shut down due to the Covid-19 pandemic. Subsequently, Dr. Richter's medical group stopped accepting Los Angeles County Medi-Cal—they were overwhelmed by Orange County Medi-Cal Enrollees.

110.   At this time, Plaintiff pled for both surgeries to be performed at UCLA. He informed Andrew Vivas, M.D. that physicians recommended both surgeries be done concurrently or in tandem, with little time between, and with the Thoracic going first, if a staged approach was necessary. Apparently, the metal hardware required to revise the cervical mutilation may obstruct the thoracic surgery.

111.   About February 22, 2021, after Andrew Viavas, M.D., failed to communicate with Plaintiff for another month, Plaintiff visited the clinic to speak with the clinic manager. While he was there talking with Celso, Vivas offered to see him for the third time. For Vivas to then reverse this simple fact demonstrates an intentional misrepresentation contributing to his overall scheme to defame Plaintiff. It would be unreasonable and

unrealistic for a patient to appear without an appointment but demand to see a spine surgeon but that did not occur, despite Vivas false, revisionist history.

112.   Plaintiff advised Andrew Vivas, M.D., that the anesthesia pre-surgical clearance would soon expire. Plaintiff had fulfilled that prerequisite swiftly as he was grateful and eager to receive the surgery that would relieve his severe pain, bodily dysfunctions and save his legs. Plaintiff also informed Vivas of UCLA School of Dentistry's shocking refusal to treat him, after scheduling him for treatment long ago. He also told Vivas that he would see Venice Family Clinic for evaluation.

113.   It was only later on about March 5, 2021, that Dr. Lord's clinic team called Plaintiff and informed him that he was referred to Dr. Elizabeth Lord for _**a consult only**_. Andrew Vivas, M.D., did not tell Plaintiff about this referral, let alone explain his reasoning so that Plaintiff could have complied. Worse, that same day, Vivas wrote and published his defamatory purported medical report—without any preliminary discussion of its content with Plaintiff, his patient, an act not in his patient's best interest.

114.   Nevertheless, in Andrew Vivas, M.D.'s slanderous published report, he failed to mention these true historical, germane facts. Instead, he manipulated them in order to "color" Plaintiff as non-cooperative. Contrarily, the true facts demonstrate that Plaintiff was very attentive to Vivas' surgical plan, concerns and instructions.

115.   These matters fall not only under Manipulation of Historical Facts but also under the categories of Ad Hominin Attacks and Manipulation of Medical Protocol. The following facts are of an equally grave nature and represent further manipulation of medical protocol.

**Defendants manipulated medical protocol with the malicious intent to slander Plaintiff.**

116.   There exists a legal theory that when police officers act within the "Color of the Law," and behave illegally, they commit severe crimes, due to the overwhelming leverage of exercising governmental authority against civilians. Likewise, by analogy, here, Defendants, "Acted within the color of medical law," but violated fundamental rules of the medical industry to, "Do no harm."

117.   Therefore, because Andrew Vivas. M.D., manipulated facts, history and medical protocol, he must be held to a higher degree of accountability because his actions not only harmed Plaintiff to a severe degree due to the undue disadvantages between patient and physician, but because he has demonstrated a profound propensity to harm his patient. For the well-being of the medical industry, his actions require scrutiny and accountability.

118.   Not only did Andrew Vivas, M.D. mislead Plaintiff by scheduling the pre-surgical clearance with Anesthesia, but there is another critical aspect of the destructive and false nature of Vivas' account found in his published purported medical report. He pulled a classic switch of facts. Like a magician's sleight of hand to achieve an illusion, Vivas switched the truth that he agreed to perform the Thoracic AWS surgery with the false allegation that he was trying to arrange for Plaintiff's cervical spine surgery.

119.   This is patently false. During Plaintiff's first appointment with Andrew Vivas, M.D., Plaintiff presented a binder with the past medical reports confirming the "Idiology," of his rare thoracic Arachnoid Web of the Spine disorder. In fact, UCSD neuroradiologist confirmed AWS as early as October 2019.

120.   Previously, only Macyzyn denied its existence, as well as the need for revision c-spine surgery, and thereby denied Plaintiff both surgeries. Suddenly, Andrew Vivas., M.D., emulated his colleague's unjust denials and then revised history to falsely justify his revised stance of denial, and in the process, harmed Plaintiff and further exposed the departmental discrimination.

121.   Equally relevant, after it was apparent that the trio at UCLA, Macyzyn, Vivas and Lord were prone to lie and deny, Plaintiff sought care from UCSF. November 4 and 24, 2021, UCSF repeatedly confirmed the, "Severe," state of the AWS and severe compression of his spinal cord.

122.   Therefore, Andrew Vivas, M.D. is "sandwiched," between extensive evidence of the diagnosis of AWS that he, too, originally confirmed, but later tried to falsely characterize as of "unknown ideology."

123.   Likewise, the severity of the AWS is either because UCLA's trio of liars and deniers delayed surgery for so long that Plaintiff's injury worsened and he faces permanent morbidity due to Defendants' discriminatory delays/denials, or, it was severe all along and UCLA spine surgeons and radiologists lied about its severity, and justification for surgical intervention, all along.

124.   These facts when contrasted with Macyzyn's and Vivas' denials, makes UCLA Spine Dept. either inferior to the other UC Medical Center Spine Depts., and/or, demonstrates their discriminatory animus against Plaintiff, as well as their deliberate misrepresentation of facts regarding his established diagnosis.

125.   This leads to Andrew Vivas, M.D.'s additional manipulation of medical protocol. Plaintiff does not believe Vivas is a licensed Psychiatrist. Yet, he made several statements about Plaintiff's supposed mental

instability. Vivas also proposed psychiatric diagnoses. His actions were directly injurious to Plaintiff in several ways. Primarily, prospective spine surgeons will review Plaintiff's medical history. Vivas' purported medical report is a pivotal point in any surgeon's consideration of Plaintiff's spine case. It caused irreversible damage to Plaintiff by declaring he is a troubled, problematic patient and insinuating he supposedly presents a liability to future surgeons. Also, as explained above, Plaintiff was not granted an opportunity to refute Vivas' malicious allegations and since he did not learn of the report until August 6, 2022, Vivas' intended damage was inflicted long ago and continues today.

126.   If Plaintiff is correct and Andrew Vivas, M.D., is not a licensed Psychiatrist, a fact easily established during discovery, then he practiced medicine without a license. Yet, the authority of his medical standing imbued his false diagnoses as if the opinions possessed medical authority and he thereby defamed Plaintiff—on an issue that is protected by his status as an Adaptive person with disabilities. Also, if Vivas truly believed his false diagnoses, medical protocol requires him to at least first speak with Plaintiff, his patient about them. Yet, he failed to take this step. Instead, he leap-frogged over Plaintiff and published his false unqualified opinions. This is equally revealing of Vivas' malice.

127.   Andrew Vivas, M.D., mentioned UCLA Dr. Pouratian in a false manner to make it appear as if he was part of Plaintiff's search for spine surgery for the AWS. In fact, Plaintiff saw Dr. Pouratian in 2013. He diagnosed cerebral atrophy, presumably caused by the Gadolinium Toxicity. The level of contempt and disrespect Vivas demonstrated through his manipulation of this critical diagnosis is severe and telling of his true motives, like when he acted as a psychiatrist to publish false diagnoses.

Vivas' animus inherent in this tactic almost eclipses the unintelligent tactic of grouping Pouratian with himself and Macyzyn for events that took place seven years later, wholly without Pouratian's involvement, and only regarding Plaintiff's spinal injuries, not his brain injury.

128.   Andrew Vivas, M.D., mention the neurostimulator surgical pre-requisites as if they are unique to Plaintiff and therefore supporting his false diagnosis of Plaintiff's psychiatric state. Vivas' malicious characterization about Plaintiff supposedly denying psychological assessments is false. Every patient who is a candidate for a neuro-stimulator may be asked to partake in a psychological assessment. Plaintiff was not. In fact, both of his neurostimulators were installed by the UCSD Neurosurgeon Dr. John Alksne, many years prior to meeting you. The first became grossly infected and had to be removed. The second one was defective and was later removed, too, by UCI Neurosurgeon Dr. Frank Hsu, to facilitate the radiological imaging of my Arachnoid Web of the Spine. UCSD Dr. Alksne was retiring and UCLA refused to help me despite the severe infection and subsequent injury to my skull and cranial nerves and consequential need for revision cranioplasty.

129.   Andrew Vivas, M.D., has revealed himself to be a cruel person who has a very poor relationship with medical and confidential facts and mispresents them in order to harm patients to cover his own failings and ability-based discrimination of Plaintiff.

### Defendants discriminated against Plaintiff.

130.   Andrew Vivas, M.D., denied Plaintiff the appropriate and timely Thoracic AWS surgery. Thereafter, he attempted to conceal his abandonment and denial of full-equal-fair medical services. Instead, Vivas publicly manipulated Plaintiff's protected medical information about his

exacerbated disabilities and defamed him in many other ways through his libel per se. He thereby intentionally and effectively discriminated against Plaintiff due to my disabilities.

131.   Oddly, Andrew Vivas, M.D., made elaborate attacks against Plaintiff's public campaign to advocate for Adaptive persons with disabilities enrolled in Med-Cal, falsely characterizing Plaintiff's self-advocacy for a dozen surgeries as a, "Conspiracy," campaign, thereby escalating his discriminatory attack against Plaintiff to a reprehensible level.

132.   Yet, one of the first documents that Andrew Vivas, M.D., requested from Plaintiff was his surgical history. Plaintiff pulled it from his binder and provided it to Vivas to copy, during their first appointment. It is about five or six pages long, lists the date and type of procedure Plaintiff has received since the Gadolinium Toxicity, as well as the level of sedation and the unjustifiable delay between prescription of the procedure and the time he finally received it.

133.   First, as explained above, there is nothing "conspiratorial" when Plaintiff freely discusses the *public* entities and their *public* policies, actions and inactions that are harming him and all Medi-Cal Enrollees. Secondly, Andrew Vivas, M.D., possessed Plaintiff's surgical history information and could readily confirm its accuracy regarding unwarranted surgical delays, but instead, he did not mention it in his malicious purported medical report.

134.   In fact, Plaintiff has received about 100 procedures. For the delayed and denied procedures, now including Vivas, the average delay between diagnosis and prescribed surgical intervention and actual receipt of surgery is 3 ¾ years and Plaintiff has to drive 1,000 round-trip miles to beg for them.

135.   Yet, Vivas elected to attack Plaintiff and demean his meritorious ADA fight for life and treatment for his exacerbated disabilities by mischaracterizing Plaintiff's well substantiated complaint for delayed and denied medical services as, "Conspiracy theories," rather than address the inhumane policies that are causing this horrific pattern of facts. Simply, criticism of the management of an existing governmental or medical program does not make for a conspiracy but in Vivas' biased mind.

136.   Yet, Andrew Vivas, M.D.'s oppression of Plaintiff through his defamatory and libelous allegations constitutes an intentional effort to further harm Plaintiff, after he already abandoned him. Now, if done in collaboration with others, say under secrecy, that may just be Vivas' "Conspiracy," to harm Plaintiff.

137.   Afterall, Andrew Vivas, M.D., 'secretly' contacted Risk Management. They and presumably management are aware of his purported medical report, condoned it, and presumably helped him craft his attack against Plaintiff, after Defendants refused to provide Plaintiff with two necessary life-sustaining spine surgeries, not to mention the other outstanding surgeries.

**Summary of Defendants' Discriminatory Defamation Per Se:**

138.   Andrew Vivas, M.D., acted with malice. He manipulated and misrepresented facts, history and medical protocol and thereby harmed and defamed his patient through his defamation and libel per se in the vein attempt to conceal his and his colleagues' multiple-year unjustifiable intentional and effectuated discriminatory actions and inactions including the denials of medical services, including two complex spine surgeries, to Plaintiff's severe detriment.

139.   Soon thereafter, Plaintiff could no longer tolerate the abuse, on-going harassment and hostile environment and stopped advocating for Spinal medical services at UCLA—which is what they wanted.

### UCLA Summary:

140.   UCLA administrators and physicians have denied Plaintiff timely medical care including twelve surgeries and thereby discriminated against him, an Adaptive person with disabilities enrolled in Medi-Cal, and the UCLA police assaulted and battered him and UCLA administrators and physicians committed fraud against California, the federal government and Plaintiff and have created a hateful violent exclusive medical center on taxpayer funds that intentionally excludes the most vulnerable residents of California.

### UCI

### Neurosurgery

141.   UC Irvine Neurological Surgery Chair and professor Dr. Frank Hsu initially agreed to perform the Thoracic Spinal Cord surgery and a revision craniotomy. Yet, Dr. Frank Hsu later reneged and denied both the craniotomy and spinal cord surgery.

142.   On about July 3, 2018, Frank Hsu, M.D., performed the pre-requisite surgery to remove the neuro-stimulator in preparation for the surgeries and ordered necessary imaging and consults. Plastic surgery agreed to partake in the revision craniotomy.

143.   On about July 18, 2018, and November 28, 2018, UC Irvine Frank Hsu evaluated Plaintiff for a thoracic arachnoid cyst.

144.   On about January 11, 2019, UCI Neurosurgery referred Plaintiff to UCI Neuromuscular Dept. Seyed Sajjadi, M.D., evaluated Plaintiff.

145.    January 22, 2019, UCI Plastic Surgery agreed to participate in the revision Cranioplasty that Dr. Hsu agreed to perform.

146.    February 13, 2019, Dr. Hsu evaluated Plaintiff for a thoracic arachnoid cyst and ordered CT myelogram of Patient's spine.

147.    Yet, UCI Radiology would not schedule/perform the imaging.

148.    From about February through August, 2019, inclusive, Plaintiff pled for the imaging and surgery. Yet, Dr. Hsu abandoned Plaintiff and refused to see him again, thereby denying him revision cranioplasty surgery and the Thoracic spine Arachnoid Web release surgery. He also refused to transfer his care to other UCI neuro/spine surgeon.

149.    Yet, about August 28, 2019, UCI neurosurgeon Amer Khalil, M.D., Director of Spine Surgery, Dept. of Neurological Surgery, co-published a report on Arachnoid Web of the Spine (AWS) disorder, confirmed the urgency to surgically treat it, and, thereby demonstrated that UCI denied this service and thereby wrongfully discriminated against and denied Plaintiff appropriate and timely medical services, including surgery.

150.    Soon thereafter, Plaintiff could no longer tolerate the abuse, on-going harassment and hostile environment and stopped advocating for Spinal medical services at UCI Neurosurgery—which is what they wanted.

**UCI Orthopedics:**

151.    Likewise, from 2017 through 2018, UC Irvine Orthopedics denied Plaintiff any orthopedic joint surgeries. Once Plaintiff submitted a grievance, the clinic refused to see him again, thereby discriminating against him and retaliating against him for exercising his civil rights.

**UCI Ophthalmology:**

152.   On about January 17, February 14, March 7, June 20, and September 19, 2019, UCI Ophthalmology evaluated Plaintiff and diagnosed neuro-ophthalmological disorders but failed to treat him.

153.   Soon thereafter, Plaintiff could no longer tolerate the abuse, on-going harassment and hostile environment and stopped advocating for Ophthalmological medical services at UCI—which is what they wanted.

154.   About November 18, 2020, Plaintiff filed a civil rights violations complaint,   #30-2020-01170869-CU-NP-CJC,   against   UC   Irvine   and relevant physicians. Due to his exacerbated disabilities and severe medical incapacitation and surgeons' refusal to treat him, he could not tend to it.

## UCSD

### Neurosurgery:

155.   On about May 21, 2019, July 24, 2019, August 6, 2019 and September 25, 2019, Dr. John Alksne and UCSD Dr. Marc Schwartz evaluated Plaintiff and kindly scheduled him for revision craniotomy but on the day of the surgery, the hospital staff would not admit him and thereby discriminated against him. Soon thereafter, Dr. Alksne retired.

156.   Soon thereafter, Plaintiff could no longer tolerate the abuse, on-going harassment and hostile environment and stopped advocating for Neurosurgery medical services at UCSD Neurosurgery.

### Orthopedics:

157.   About February 15, 2019, UCSD Kenneth Vitale, M.D., evaluated Plaintiff's hip and referred him to Drs. Robertson and Gonzales.

158.   About July 12, 2019, UCSD performed CT with contrast of Plaintiff's shoulders and diagnosed numerous superior glenoid lesions

159.   About July 16, 2019, UCSD Dana C Convey, M.D. evaluated Plaintiff's shoulders and denied any injury and thereby denied surgery.

160.   About March 8, 2019 UCSD Francis Gonzales, M.D. evaluated Plaintiff's hips and denied any hip disorders and thereby denied surgery.

161.   About August 29, 2019, UCSD performed CTs with contrast of Plaintiff's bilateral hips but they refuted any injury and thereby denied him any further Orthopedic or Sports Medicine hip appointments or surgeries.

162.   Soon thereafter, Plaintiff could no longer tolerate the abuse, on-going harassment and hostile environment and stopped advocating for Neurosurgery medical services at UCSD Neurosurgery.

**Neurospine Surgery**

163.   February 26, 2020, UC San Diego neurosurgeons Dr. Ciaci and Dr. Martin promised to repair Plaintiff's thoracic spinal cord Arachnoid Web. Instead, they coerced and deceived him and performed an unnecessary cervical posterior six-level fusion surgery in a highly negligent manner, fused him in a kyphotic position, drove a pedicle screw into his spinal canal. Their discriminatory assault and negligence adversely impacts not only his spine but his heart, lungs and back.

164.   Their use of Plaintiff as a lab rat for fellows to practice upon is a woeful disregard for Plaintiff's well-being and civil rights; it is a heinous act of ability-based discrimination to take advantage of a desperate Adaptive patient with disabilities and medical assault.

165.   Not only did Plaintiff run for his life after the UCSD staff harassed him and he realized their mutilation of his cervical spine, but he cannot return to UCSD as a result of the outrageous abuse and because Plaintiff could no longer tolerate the abuse, on-going harassment and hostile environment and stopped seeking medical services at UCSD.

166.   About February 2021, Plaintiff filed a medical battery, civil rights violations, and medical negligence complaint, #37-2021-00019542-CU-CR, against UCSD and surgeons Dr. Ciacci and Dr. Martin.

## UC Davis

167.   February 2022, UC Davis Chief of Spinal Neurosurgery and Co-Director of UC Davis Spine Center Dr. Kee Kim falsely claimed there was nothing wrong with Plaintiff's Thoracic spinal cord.

168.   Subsequently, UC Davis Vice-Chair of Administration and Co-Director of the UC Davis Spine Center, Orthopedic Spine surgeon Dr. Eric O. Klineberg invited Plaintiff to drive from Los Angeles to meet him. Yet, in the appointment, he falsely asserted his colleague Dr. Kee Kim was correct and Plaintiff does not have a thoracic injury.

169.   Oddly, after his false assertion decimated physician-patient trust, he offered to fix Plaintiff's cervical spine. Shocked, Plaintiff declined as holistic care is critical and one surgery alone will adversely impact the neglected, untreated remaining spinal injury and place Plaintiff at risk.

170.   Their actions were discriminatory and a fundamental method of manipulating medical protocol to deny the need for complex spinal cord surgery and thereby denied Plaintiff the same full-equal-fair services they offer to enabled patients with alternative insurance.

171.   The refusal to provide Plaintiff holistic care for all of his serious spinal injuries is a form of discrimination as Plaintiff is being piecemealed to death while surgeons wrongfully deem which surgeries warrant their attention and which do not—a function of their self-interests as faculty at a teaching medical center—not in the interest of the patient.

172.   Soon thereafter, Plaintiff could no longer tolerate the abuse, on-going harassment and hostile environment and stopped advocating for medical services at UC Davis.

**UCSF:**

173.   November 4, 2021 and November 24, 2021, UCSF performed a CT Myelogram and Fiesta MRI, respectively. The neuroradiologists assessed the compression to be severe. After about five years of being denied the surgery, Plaintiff has lost about 60% of his spinal cord volume in the T5-T6 region.

174.   Though the plan was for Plaintiff to be admitted to the hospital on December 19th, so he may receive cardiology testing, unfortunately, the administration refused to admit him. This frustrated Plaintiff and seriously fatigued him after the already exhausting two-day, four-hundred-mile drive from Los Angeles. After Social Services intervention, he was admitted at about 5:00pm. Ironically, this revealed that Plaintiff's heart was too weak. The repeated climbing up San Francisco hills, each time he was refused admission, and the altercations made it glaringly obvious he was constantly and excessively, 'out of breath.'

175.   December 20, 2021, UCSF Neurospine surgeon Dr. Tan was to perform the thoracic Arachnoid Web of the Spine surgery. Yet, the morning of the surgery UCSF Cardiology gave a false surgical clearance without performing any tests and Dr. Tan expressed more interest in his schedule than Plaintiff's well-being. Plaintiff was forced to object and to exercise his right of self-preservation. Surgery was scrubbed.

176.   Weeks later, UCSF Electrophysiologist Dr. Marcus kindly intervened. He ordered tests. Thereafter, he diagnosed Chronotropic Incompetence and Sick Sinus Node Syndrome and prescribed surgery to

install a pacer, prior to any spine surgery. Given Plaintiff's complex medical profile and unique matrix of twelve outstanding surgeries. Each surgery, particularly the administration of anesthetic drugs, imposes a significant load upon his heart.

177.   May 16, 2022, UCSF Dr. Marcus performed heart surgery, about two years after Mammoth Orthopedic Institute physicians first identified Plaintiff's cardiological disorder—after eight years of UCLA's discriminatory denials of appropriate and timely medical services.

178.   The benefits are like a second lease on life and provides Plaintiff with the strength to file this complaint and fight Defendants' lethal and discriminatory deprivations.

179.   Alas, since December 20, 2021, Plaintiff repeatedly tried to communicate with Neurospine to learn the details of the refusals to admit him. Yet, eight months later, no one will discuss it.

180.   Worse, since January 20, 2022, UCSF Dr. Tan failed to adequately respond to Plaintiff's letter requesting he be rescheduled for thoracic Arachnoid Web spinal cord surgery. The lack of professional follow-through is debilitating, and again, just like 2015, just another form of blaming the victim—years of UCLA Cardiology's failure to diagnose and UCSF refusal to admit Plaintiff and UCSF Cardiology's false surgical clearance—and retaliating against him for the violators' actions.

181.   Due to Plaintiff's persistent requests for an explanation, about August 8, 2022, Lee Tan, M.D., published a reason for rejecting Plaintiff. He stated,

> "After carefully reviewing his records and imaging, I think there
> is high risk for significant surgical complications and therefore I

don't recommend surgery. He is welcomed to get second

opinion from other surgeons."

182.    Yet, Lee Tan, M.D., will not provide an explanation of the new information he gleaned from Plaintiff's, old "Records and imaging." He has yet to explain why it took him more than seven months after he originally scheduled the surgery to assert Plaintiff possesses *unidentified* high risks of surgical complications and therefore does not recommend surgery.

183.    Likewise, Lee Tan, M.D. will not explain why he subsequently sent a flawed referral to Orthopedic Spine. (He is neurospine.) It is flawed because, it references an, "Intradural pathology."

184.    Indeed, about August 11, 2022, Vedat Devirine, M.D., declined Plaintiff's case and the Ortho-Spine Dept. declination notice states,

"We have determined there is no need for you to seek tertiary care here at the Ortho Spine Clinic. Your case states that you have an intradural arachnoid cyst, meaning pathology inside the spinal canal. Ortho spine surgeons do not perform surgery inside the spinal canal unlike Neurosurgeons in the Neuro-Spine Department."

185.    Despite Plaintiff's extensive inquiries, well over twenty preemptive phone calls to both departments to resolve the discriminatory misrepresentations of him and his surgical needs, the Ortho-Spine Dept. and Neuro-spine Dept. and the Co-Piloting Program refused to accommodate Plaintiff. Neo one from the three departments would timely modify their position and provide a truthful evaluation and thereby wrongfully discriminated against Plaintiff and denied him two critical spine surgeries. Therefore, their injurious action especially after ten months—are intentional discriminatory and exclusionary.

186.   Therefore, (1) the extreme delay in Dr. Tan's follow-up; (2) his failure to provide an explanation for the supposed high risks that exclude Plaintiff from consideration of surgery—surgery previously scheduled over seven months ago but canceled by no fault of Plaintiff; (3) and his flawed referral to Orthopedic Spine, leaves Plaintiff with no other conclusion but that Lee Tan, M.D., intentionally discriminated against him, played a 'long-game' tactic to deny necessary surgeries, even after Plaintiff received heart surgery to address his *only known* complication, and, intentionally dissuaded his peers and Ortho-Spine Dept. from providing him surgeries.

187.   In addition, Christopher Ames, M.D. a neurospine surgeon who is a lead surgeon of UCSF's Co-Piloting program, declined Plaintiff's case because, according to his staff, it is "Too small." Yet, according to his Youtube videos and numerous published articles and papers on UCSF's Co-Piloting Program, they concentrate on cases of kyphosis, revision surgery and pre-existing complications that present high surgical risk.

188.   Though Plaintiff presents with these medical facts, Dr. Ames rejected Plaintiff's case, because, it is, "Too small." Yet, on August 11, 2022, Plaintiff received Dr. Ames' written declination notice. It states,

> "Referral was declined. Dr. Ames practice is focused on spine tumor, scoliosis and big deformity. Patient is also at high risk of significant surgical complications."

189.   Obviously, the aggregate impact of these "moves," excludes Plaintiff from any appropriate and timely spine surgeries. Instead, Plaintiff contends the involved surgeons and other unknown persons unjustly deceived Plaintiff and delayed him and denied necessary spine surgeries and thereby discriminated against him, due to his disabilities.

190.   Now, Plaintiff can no longer tolerate the abuse, on-going harassment and hostile environment and will stop advocating for spinal medical services, including surgeries at UCSF—which is what they wanted—and instead sue them—which they apparently prefer.

### Cedars-Sinai Medical Center:

191.   2017 to the present, Cedars Sinai Medical Center and its administrators and   physicians violated and continue to violate Plaintiff's state and federal civil rights and the laws prohibiting ability-based discrimination by denying him, an adaptive person with disabilities enrolled in Medi-Cal, needed neurosurgeries and orthopedic surgeries including two critical spine surgeries, bilateral shoulder, bilateral elbow, bilateral hip surgeries, as well as vocal cord surgery and other medical services to treat his exacerbated disabilities and injuries, and failed to and continue to refuse to provide appropriate and timely surgeries and other medical treatment to treat his exacerbated disabilities and injuries.

192.   Instead, Defendants refused to fulfill their obligations to Plaintiff, an Adaptive person with disabilities enrolled in Medi-Cal, to provide all necessary medical services including surgeries. Instead, Defendants committed fraud and fraudulently induced Plaintiff and Medi-Cal to incur costs for preliminary appointments and evaluations then subsequently refused to provide necessary, appropriate and timely medical services including surgeries to treat his exacerbated disabilities and injuries.

193.   Cedars' style of "push-back," and denials stem from a corporate contempt for poor persons with disabilities enrolled in Medi-Cal. Their disdain for such individuals is blatantly exercised every day. Cedars Sinai intentionally 'played,' Plaintiff by insidious techniques of fraudulent

inducement only to ultimately deny him any of the urgently needed medical services including at least ten surgeries: (1) removal of the infected neurostimulator; (2) revision cranioplasty; (3/4) bilateral shoulder surgeries; (5/6) bilateral elbow surgeries; (7/8) bilateral hip surgeries; (9) vocal cord surgery; (10) heart surgery.

194.   Regardless of the escalating risk of permanent morbidity caused by their wrongfully denied treatment, Cedars refused Plaintiff any surgical care.

195.   Instead, after Plaintiff filed a grievance and notified Defendants of their unlawful violations of his civil rights and failures to fulfill their obligations to Medi-Cal and its Enrollee to provide all necessary medical services including surgeries, they retaliated against Plaintiff for filing a grievance for their ability-based discrimination and violation of his civil rights and fraud by banning and excluding him from Cedar Sinai medical services including surgeries.

196.   Cedars intentionally intimidates poor Adaptive persons with disabilities enrolled in Medi-Cal to generate a hostile environment to not only chase away individual M-C Enrollees they perceive as undesirable but to build a repulsive reputation of intolerance to scare off other M-C Enrollees from seeking care from them, except for their preferred classifications. They falsely claimed they have an inclusive policy, when in fact, they discriminated against Plaintiff. Rather than treat, they mistreat.

197.   Plaintiff filed a complaint for discrimination in Los Angeles Superior Court, #21STCV13773. Yet, he was too ill due to his exacerbated disabilities and UCSD's cervical mutilation to tend to it. Seven months after it was filed, the Judge dismissed it, without prejudice. Plaintiff filed his Motion to Set Aside the Dismissal late, again due to severe medical

incapacitation. Therefore, about August 4, 2022, the judge denied the motion. Hence, that complaint is incorporated herein by reference and in accordance with the Continuity Doctrine and Separate Violations Doctrine.

198.   About November 20, 2020, Mammoth Orthopedic Institute Dr. Timothy Crall sent a referral for Plaintiff to see his friend, an Orthopedic spine surgeon, Sang Kim, M.D., at Cedars Sinai.

199.   Yet, about November 23, 2022, as a further step of retaliation, Orthopedics clinic manager Carol Dobashi telephoned Plaintiff and denied him the spine referral and any medical service, citing his past grievance and their retaliatory expulsion of him from Cedars Sinai as a reason for denial of the current referral. She stated Dr. Kim does not want ot see me, and, You had one surgery and you only get one," and, "*You know why* … *We already discharged you because we could not come to terms.*"

200.   Soon thereafter, Plaintiff could no longer tolerate the abuse, on-going harassment and hostile environment and stopped advocating for spinal medical services at Cedars—which is what they wanted.

### Stanford Health Care:

201.   Stanford Health Care internet home page, https://med.stanford.edu/health-care.html, states,

"Stanford Medicine delivers unparalleled care for *each patient's unique needs*. Our multidisciplinary approach to health care coordinates expertise with the most advanced technology for the best possible outcomes." [Emphasis added.]

202.   In about 2015, Stanford University Orthopedic Department denied Plaintiff necessary orthopedic joint surgeries.

203.   About six years later, from December 2020 through July 2021, Stanford University Neuroscience neurospine surgeon Dr. Zigourakis

discriminated against Plaintiff. Dr. Zigourakis mishandled his ADA request and neglected Plaintiff and thereby obstructed his access to health care. During this neglect, he escalated his pleas for help.

204.   Plaintiff stated his ADA and medical needs. Yet, Dr. Zigourakis and her staff declined to advocate for him and instead blamed neuroradiology. Simply, they refused to provide the pre-procedure prescriptions of Prednisone and Benadryl to counteract any adverse reaction to the Iodine based contrast dye.

205.   Eventually, they presented an alternative that Plaintiff receive the imaging at UCLA but UCLA had refused Plaintiff that very service, twice. When Plaintiff explained its infeasibility, they simply abandoned him.

206.   Then, about July 2021, The Neuroscience Director, Sophia Loo, and assistant manager Christine Bulnes called Plaintiff, twice. The second time was a terrible encounter with them. Plaintiff already identified Christine as a key source of conflict. Therefore, her inclusion in the tele-conference was inappropriate and suspect.

207.   Sophia Loo and Christine Bulnes attempted to reframe Plaintiff's ADA request for accommodation as an unreasonable complaint of mere inconvenience, i.e., a post-procedure "Ride" home. When the conversation turned injurious, Plaintiff asked to terminate the call. Yet, they continued to harass him and attempted to bully him into canceling the scheduled July 19, 2021, CT Myelogram! When he 'called them out' for their unjust, uncivilized discriminatory actions, they had the gall to blame him for insulting them!

208.   While they continued with confrontational tactics, Plaintiff refused to cancel the scheduled imaging. It was too critical and should have occurred six months earlier. Also, Stanford employs a renowned

neuroradiologist well versed in imaging Arachnoid Web of the Spine and many other radiological matters, Max Wintermark, M.D.

209.   Then suddenly, they came up with a new exclusionary tactic: Neuroradiology refused to perform the ordered CT Myelogram if Plaintiff is not, "Associated," with a surgeon. As Dr. Zigorakis had abandoned Plaintiff and he therefore requested a new surgeon but Sophia Loo refused his request, they falsely claimed he was not "associated," with the medical center and canceled his CT Arthrogram.

210.   Their conduct was not only non-conducive to resolution, Sophia Loo and Christine Bulnes exponentially escalated the conflict, as well as Plaintiff's injuries, through their retaliatory actions and refusal to accommodate his Adaptive ADA and medical needs.

211.   First, Plaintiff has a notorious history of adverse reaction to contrast dyes. He has suffered CIN (renal failure), NSF (Nephrogenic Systemic Fibrosis) from a Gadolinium Based Contrast Agent (GBCA), severe adverse reaction to Definity contrast dye and he was previously diagnosed as being at risk of iodine contrast dye intolerance.

212.   Second, Nephrogenic Systemic Fibrosis, Plaintiffs main medical diagnosis is his primary disability recognized by Social Security. Hence, his difficulty with contrast dyes is a disability to be accommodated by Stanford as medically required and as he requested for six months.

213.   Third, when Sophia Loo refused to consider his declared needs, she did not treat him as an Adaptive person with disabilities in need of minor accommodation that is reasonable and consistent with the prevailing medical standard of care. Without prior, timely agreement to provide pre-procedure prescriptions and/or temporarily admit him for post-

procedure observation, once again, she discriminated against him and he was injured by Neuroscience's premeditated discrimination and exclusion.

214. Their Tuesday July 13th refusal to accommodate Plaintiff—Stanford refused to provide pre-procedure prescriptions and/or confirm post-procedure observation—obstructed Plaintiff's receipt of the imaging as scheduled at 07:00am on July 19, 2020. Likewise, Sophia Loo malicious manipulation of a supposed departmental requirement of physician "association," was a fabrication and manipulation of the facts employed by Sophia Loo as false justification of her and Dr. Zigourakis' six months of unjustifiable discrimination and exclusion.

215. Dr. Zigourakis, Sophia Loo and Christine Bulnes transgressed the established boundaries of civilized professionalism, compassionate care and appropriate, safe accommodation, not to mention they failed to, "Deliver unparalleled care for *each patient's unique needs*."

216. Stanford must assure diversity and provide full access to all patients through accommodation, especially during necessary medical procedures—as per the specific patient's ADA and medical needs.

217. Instead, those involved abused medical protocol to deny Plaintiff full-equal-fair and safe access to appropriate and timely medical services including imaging and two spine surgeries. ADA Accommodation does not mean providing the *same* means and methods to a person with disabilities as one may provide to enabled patients. That unjust tactic ignores the inherent systemic obstacles to access, excludes and prevents the Adaptive Patient from being *accommodated* and realizing medical treatment. The medical provider is legally obligated to provide *tailored* means and methods to accommodate the physical and medical limitations of the Adaptive person with disabilities.

218. Yet, here, Plaintiff's needs do not call for "tailored," accommodations. His needs were contained well within prevailing medical standards for patients with renal impairment and known contrast incapacitation.

219. Additionally, regarding the initial, peculiar encounter with Orthopedic Spine surgeon, John Kleimeyer, M.D, the referring physician, Mammoth Orthopedic Institute Orthopedic surgeon Dr. Timothy Crall contacted John Kleimeyer, M.D. to resolve any misunderstanding. Dr. Kleimeyer kindly agreed to treat Plaintiff. Yet, when Plaintiff called to reschedule, the clinic's administrative staff obstructed Plaintiff and *advised* him to seek care elsewhere.

220. Soon thereafter, Plaintiff could no longer tolerate the abuse, on-going harassment and hostile environment and stopped advocating for spinal medical services at Stanford—which is what they wanted.

### Sutter Health

221. August 2021, Sutter Health scheduled Plaintiff for multiple medical appointments to assess his spinal injuries. Sutter Health physician Dr. Rudolph Shrot is one of the few surgeons in the United States that surgically treats Spinal Turlov Cysts, which Plaintiff suffers. Yet, the day before his scheduled appointment, just as Plaintiff left Los Angeles, Sutter Health canceled his appointments.

222. Plaintiff complained to the administration but they further harassed and discriminated against him and retaliated against him by refusing to rectify the wrongful, last-minute cancellation and fulfill his request that they accommodate him and treat his exacerbated disabilities.

223. October 2021, Sutter Health finally acquiesced and agreed to perform the necessary spinal imaging, first. They scheduled Plaintiff for a

CT Arthrogram and fraudulently induced him to travel from Los Angeles to Sacramento, about 1,000 round-trip miles.

224.   Upon his arrival and check-in at Sutter Health Sacramento, Sutter Health reneged and denied him the CT arthrogram. They failed to order the pre-procedure prescriptions that reduces the risk of an adverse reaction to the iodine-based contrast dye for Plaintiff—the same discriminatory tactic Stanford employed.

225.   Plaintiff complained again and simply asked Sutter health to reimburse him for the cost of gasoline for his round trip from Los Angeles but Sutter Health refused to compensate him and refused to address the discriminatory refusal to accommodate/treat him so he may receive the CT arthrogram with pre-procedure prescriptions to reduce the risk to him. Sutter Health refused to provide the pre-procedure prescriptions of Prednisone and Benadryl to counteract any allergic reaction to the Iodine based contrast dye. Theirs was a fraudulent and abusive act of ability-based discrimination.

226.   November 2021, Sutter Health performed the wrong MRI of Plaintiff's spine. Plaintiff requested a Fiesta II MRI whereas Sutter performed a standard MRI.

227.   Sutter Health charges to Plaintiff's Medi-Cal account are fraudulent in that they failed to properly accommodate him as an Adaptive person with disabilities and provide the appropriate and necessary medical services he is entitled to receive and performed the incorrect imaging.

228.   Soon thereafter, Plaintiff could no longer tolerate the abuse, on-going harassment and hostile environment and stopped advocating for spinal medical services at Sutter Health—which is what they wanted.

### University of Southern California, Keck Medical Center

229.   USC Keck Hospital Spine Clinic instructed Plaintiff to visit LAC+USC to obtain a referral to their clinic. October 2021, LAC+USC denied Plaintiff any medical care. Also, the Urgent Care physician refused to refer him to any specialty clinic and without the referral he could not advance. Due to USC integral relationship with the County medical center, they, too, are responsible for this act of discrimination. In response, USC Spine Clinic kindly scheduled Plaintiff without LAC+USC Urgent Care referral but then escalated the discrimination.

230.   About February 2022, USC Keck Medical Center Neurospine surgeon and director of the Neurospine Clinic, Thomas Chen, M.D., insisted Plaintiff's spine is healthy and requires no medical attention. He stated Plaintiff could go about his life not worried about his spine. He falsely claimed Plaintiff saw his colleague Jeffrey Wang, M.D., who found nothing. He stated to Plaintiff, "You are fine."

231.   Dr. Chen's false diagnosis is the quintessential manipulation of medical protocol to deny an Adaptive Person with Disabilities enrolled in Medi-Cal the necessary medical services, let alone not one but two expensive spine surgeries. His is an act of discrimination, both ability-based and Medi-Cal discrimination.

232.   Plaintiff made more attempts to see a spine surgeon at USC-Keck but they refused to see him. Soon thereafter, Plaintiff could no longer tolerate the abuse, on-going harassment and hostile environment and stopped advocating for spinal medical services at USC-Keck—which is what they wanted.

### Dignity Health Saint Bernardine Medical Center:

233.   Dignity Health Saint Bernardine's promotional slogan is, "Hello Humankindness. Excellent care, delivered with compassion, for all in need."

234.   August 2020, Plaintiff's neurosurgeon Dr. Ali Mesiwala, who had previously performed three surgeries for Plaintiff, agreed to perform the cervical spine revision surgery but reneged and abandoned Plaintiff.

235.   About August 13, 2020, Plaintiff visited Dr. Mesiwala's office to obtain his medical records—as scheduled. He spoke with the staff and confirmed, because of traffic, he would arrive just five minutes after 5:00pm. They agreed to wait. Yet, they did not accommodate him.

236.   When he arrived, Plaintiff was passing a kidney stone and had to use the restroom but all of the restrooms in the Medical Building were locked and security advised him to visit the hospital.

237.   The Hospital's main entrance and adjacent Emergency Room Entrance were under construction and therefore presented a confusing scenario. Inside the hospital, the nurse at the Covid-19 station gave Plaintiff permission to use the restroom "just around the corner."

238.   At this point, it must be emphasized that Plaintiff is not only dependent upon crutches to ambulate but due to the February 26, 2020, cervical mutilation, he is severely kyphotic. Therefore, when walking, he cannot look up as "enabled" people without Kyphosis can achieve—he can only look down at the ground, while walking.

239.   Yet, while he was not looking up due to his pronounced kyphosis, Saint Bernardine's private security guard jumped in front of Plaintiff, unannounced, and assaulted and battered Plaintive. He grabbed Plaintiff's arms which were holding him up by his crutches. Plaintiff was shocked and scared, and reflexively, defended himself. He used the tip of

his side-stick to push the assailant off of him. He proceeded to use the bathroom, as permitted. The kidney stones created great urgency and pain and compelled Plaintiff to seek the toilet, as permitted. Afterward, he exited. Plaintiff's dependency upon crutches as an Adaptive person with disabilities in order to ambulate and his severe kyphosis placed him at undue risk of falling and severe injury. Yet, the assailant never announced himself or warned Plaintiff, which any reasonable person would do given Plaintiff's obvious and pronounced disabilities.

240.   Outside in the parking lot, first, the Security guard ordered Plaintiff to leave. Then he demanded Plaintiff stay and answer to the police. The hospital filed a false charge for trespassing that triggered an outrageous series of events including an assault by the San Bernardino police, violent arrest, and wrongful imprisonment—a devastating series of abuse and ability-based discrimination.

241.   Soon thereafter, Plaintiff could no longer tolerate the abuse, on-going harassment and hostile environment and stopped advocating for medical services at St. Bernardine—which is what they wanted.

**Origin of Plaintiff's Iatrogenic Disabilities and Morbidities:**

242.   June 12, 2009, during an MRI, Kaiser Permanente administered a contraindicated injection of the Gadolinium based contrast agent (GBCA), Magnevist. Plaintiff suffered Contrast Induced Nephropathy (CIN) (renal failure) and Gadolinium Toxicity. Kaiser lied about the facts for over a year while Plaintiff suffered severe neurological and osteoporotic toxicities. After he was assessed "Disabled," and assigned to Medi-Cal, Kaiser denied him surgeries; he left in 2013.

243.   From 2013 to present, Plaintiff sought treatment but Defendants wrongfully delayed or denied necessary medical services more than 50%

of the time, for an average of 3.75 *years* each time. Because Defendants refused him holistic care at one medical center, he has had to travel 1,000 round-trip-miles between San Diego and San Francisco while very ill, begging for care.

244. The following table details the delayed/denied medical services:

*///*
*///*

| Time Period | N/A | Local | Twlt | Anstzd | # of Prcdrs | # Delayed | Total Years |
|---|---|---|---|---|---|---|---|
| 2010-2014: | 2 | 07 | 11 | 13 | 33 | 21 | 36.25 years |
| 2015-2017: | | 14 | 02 | 14 | 30 | 12 | 35.75 years |
| 2018-2019: | | 20 | 01 | 06 | 27 | 06 | 26.50 years |
| 2020-2021: | 6 | 01 | 00 | 01 | 08 | 01 | 01 year |
| 2022: | 1 | 02 | | 03 | | 03 | 08 years |
| Outstanding: | | | | | | 11 | 95.25 years |
| **Totals:** | **9** | **44** | **14** | **34** | **101** | **54** | **202.75 years** |

**Percentage of Procedures Wrongfully Delayed and Denied:**
Previously Delayed Procedures   43
Currently Denied and Outstanding Procedures   11
Total Delayed and Denied Procedures   54
Total Number of procedures   101
*% of Procedures Wrongfully Delayed and Denied*   **~53%**

**Average Length of Wrongful Delay/Denial of Procedures:**
Total Delays in Years   202.75 yrs
Total Number of Delayed and Denied Procedures   54
*Average Delay from Diagnosis to Procedure for the 54, in years:*   **~3.75**

**Percentage of Surgeries that are Revision Surgeries:**   **~30%**

245. Plaintiff suffered and continues to suffer debilitating pain and diminished physical and cognitive capacities due to the denials of medical services including:

a. For 9 years, he has not received treatment for the extensive cerebral atrophy;

b. For 9 years, he has not received treatment for the pituitary adenoma/rathke cysts;

c. For 9 years, he has not received prescribed treatment for osteoporosis;

d. For 9 years, he has not received treatment for his hearing loss and tinnitus;

e. For 9 years, he has not received prescribed bilateral hip surgeries;

f. For 9 years, he has not received prescribed bilateral shoulder surgeries;

g. For 8 years, he has not received prescribed bilateral ulnar nerve release (elbow) surgeries;

h. For 8 years, he has not received prescribed oral surgeries and dental care to repair several broken teeth;

i. For 6 years, he has not received prescribed treatment for incessant pain from the neurological injuries including Trigeminal & Occipital Neuralgias;

j. For 6 years he has not been evaluated for undiagnosed otolaryngological disorders;

k. For 5 years, he has not received necessary neuro-stimulator replacement surgery;

l. For 5 years, he has not received prescribed thoracic spinal cord Arachnoid Web of the Spine release surgery (he has lost about 60% of his spinal cord volume);

m. For 5 years, he has not received treatment for thoracic herniated discs and damaged vertebrae, three perineural cysts and peripheral nerve impingement;

n. For 3 years, he has not received treatment for the failed sacroiliac joints fusions;

o. For 2 years, he has not received prescribed revision cervical spine surgery;

p. For 2 years, he has not received prescribed bunion surgery.

## FIRST CAUSE OF ACTION

The Americans with Disabilities Act of 1990, 42 U.S.C. § 121011 et seq.

(By Plaintiff Against All Medical Provider Defendants)

246.  Plaintiff re-alleges and incorporates by reference all preceding allegations in the complaint as though fully set forth herein.

247.  Section 302(a) of Title III of the ADA, 42 U.S.C § 12101 et seq., provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodation of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

248.  Defendants' medical centers, hospitals and offices are public accommodations according to Title III of the ADA 42 U.S.C § 1281(7).

249.  Under section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny Adaptive individuals with disabilities an opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodation, which is equal to the opportunities afforded other individuals. 42 U.S.C. § 12182(b)(1)(A)(ii).

250.  Under section 302(b)(2) of Title III of the ADA, unlawful discrimination also includes among other things: "A failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantage, or accommodations to [Adaptive] individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations; and a failure to take such steps as may be necessary to ensure that no [Adaptive] individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodation being offered or would result in an undue burden." 42 U.S.C. § 12182(b)(2)(A)(ii)-(iii).

251.  The acts alleged herein constitute violations of Title III of the ADA, and the regulations promulgated thereunder. Plaintiff is an Adaptive individual who has physical disabilities that substantially limit his major life activities of ambulating, functioning, hearing and speaking within the meaning of 42 U.S.C. § 12102(1)(A), (2)(A), and requires multiple surgeries to address his exacerbated disabilities, and he is enrolled in Medi-Cal.

252.  Medical Provider Defendants, subscribed with Medi-Cal, have denied Plaintiff full-equal-fair access to their medical centers and physicians, have delayed his access to and denied him medical services that they provide to other patrons who are not disabled or not like-disabled, and/or he has been provided services that are inferior to the services provided to 'enabled/non-disabled or not like-disabled' persons.

Defendants have failed to take any prompt and equitable steps to remedy its discriminatory conduct and policies. These violations are ongoing, and in accordance with the Continuity and Separate Violations Doctrines, past acts are included herein.

253.  Defendants retaliated against Plaintiff after he objected to their ability-based discrimination.

## SECOND CAUSE OF ACTION

California Civil Code § 51 et seq., The Unruh Civil Rights Act

(By Plaintiff Against All Medical Provider Defendants)

254.  Plaintiff re-alleges and incorporates by reference all preceding allegations in the complaint as though fully set forth herein.

255.  Civil Code § 51 et seq. guarantees equal access for Adaptive persons with disabilities to accommodations, advantages, facilities, privileges and services of all and any kind of business establishments.

256.  Defendants' medical centers, hospitals, offices are "business establishments" within the meaning of the California Civil Code § 51 et seq. Defendants generate millions of dollars in revenue from the sale of goods and medical services in California through its medical centers and offices.

257.  Defendants subscribe to Medi-Cal and receive state and federal Medi-Cal funds to provide full-equal-fair goods and medical services to Medi-Cal Enrollees, including Plaintiff.

258.  Yet, Defendants provide their medical services in a manner that are inaccessible to Plaintiff, an Adaptive patron who is disabled and enrolled in Medi-Cal. This inaccessibility denies Plaintiff full-equal-fair access to the facilities, goods and services that Defendants make available to non-disabled or not-like disabled patrons. Defendants are denying him

the goods and services they provide to 'enabled or not-like disabled' patrons not enrolled in Medi-Cal. These violations are on-going.

259.  Defendants' actions constitute intentional discrimination against Plaintiff on the basis of a disability in violation of CA. Civil Code § 51 et seq. in that Defendants have constructed and implemented their administrative and medical policies in a manner that make their goods and services including surgeries inaccessible to Plaintiff; enforce and maintain their policies to make their medical centers, offices and services inaccessible to Plaintiff, an Adaptive persons with disabilities, due to his disabilities. Defendants have failed to take actions to correct these barriers even after being notified of the discrimination that such barriers and obstructive policies cause. These violations are ongoing, and in accordance with the Continuity and Separate Violations Doctrines, past acts are included herein.

260.  Defendants violate the Unruh Civil Rights Act, California Civil Code § 51 et seq. in that the conduct alleged herein constitutes a violation of various provisions of the ADA, 42 U.S.C. § 12101 et seq., as set forth above. Section 51(f) of the California Civil Code provides that a violation of the right of any individual under the ADA shall also constitute a violation of the Unruh Civil Rights Act.

261.  Defendants are systematically violating the Unruh Civil Rights Act, California Civil Code § 51 et seq. committing distinct as well as continual violations. Defendants also retaliated against Plaintiff after he objected to their discrimination.

262.  Defendants' actions were and are in violation of the Unruh Civil Rights Act, California Civil Code § 51 et sec., and therefore, Plaintiff is entitled to remedy.

263.  Plaintiff is also entitled to statutory minimum damages pursuant to California Civil Code § 52 for each and every offense.  Plaintiff is also entitled to reasonable attorney fees and costs.

### THIRD CAUSE OF ACTION

California Government Code Section 11135 et seq.

Gov. Code § 11135 *et seq.*; 2 Cal. Code Regs. § 11154(i)(2)

(By Plaintiff Against All Medical Provider Defendants)

### Discrimination

### Defeating or Substantially Impairing the Objectives and Purposes of the Medi-Cal Program:

### a. Discriminatory Effects

264.  Plaintiff re-alleges and incorporates by reference all preceding allegations in the complaint as though fully set forth herein.

265.  In accordance with California Government Code Section 11135,

(a) No person in the State of California shall, on the basis of sex, race, color, religion, ancestry, national origin, ethnic group identification, age, mental disability, physical disability, medical condition, genetic information, marital status, or sexual orientation, be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is conducted, operated, or administered by the state or by any state agency, is funded directly by the state, or receives any financial assistance from the state. Notwithstanding Section 11000, this section applies to the California State University.

(b) With respect to discrimination on the basis of disability, programs and activities subject to subdivision (a) shall meet the protections and prohibitions contained in Section 202 of the federal Americans with

Disabilities Act of 1990 (42 U.S.C. Sec. 12132), and the federal rules and regulations adopted in implementation thereof, except that if the laws of this state prescribe stronger protections and prohibitions, the programs and activities subject to subdivision (a) shall be subject to the stronger protections and prohibitions.

(c) The protected bases referenced in this section have the same meanings as those terms are defined in Section 12926.

(d) The protected bases used in this section include a perception that a person has any of those characteristics or that the person is associated with a person who has, or is perceived to have, any of those characteristics.

266. California Government Code section 11135 and its implementing regulations prohibit discrimination in programs or activities funded by the State. Section 11135(a) provides, in pertinent part, that "[n]o person in the State of California shall, on the basis of . . . physical disability . . . be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is conducted, operated, or administered by the state or by any state agency, is funded directly by the state, or receives any financial assistance from the state."

267. Medical Provider Defendants are subject to Section 11135 and the implementing regulations because Defendants subscribe to and receive funds from Medi-Cal as a program or activity and Medi-Cal is a state-funded program.

268. Regulations implementing Section 11135 provide that it is an unlawful, discriminatory practice "to utilize criteria or methods of administration that . . . have the purpose or effect of [1] subjecting a person

to discrimination on the basis of disability . . . [or] [2] defeating or substantially impairing the accomplishment of the objectives of the recipient's program with respect to a person of a particular physical or mental disability . . ." 2 Cal. Code Regs. § 11154(i)(2) … [or] (3) perpetuate discrimination by another recipient on the basis of ethnic group identification, religion, age, sex, color, or a physical or mental disability.

269. California Government Code 11135 section (b) states, "With respect to discrimination on the basis of disability, programs and activities subject to subdivision (a) shall meet the protections and prohibitions contained in Section 202 of the federal Americans with Disabilities Act of 1990 (42 U.S.C. Sec. 12132), and the federal rules and regulations adopted in implementation thereof, except that if the laws of this state prescribe stronger protections and prohibitions, the programs and activities subject to subdivision (a) shall be subject to the stronger protections and prohibitions."

270. By their actions, Medical Provider Defendants violated California government code § 11135. Medical Provider Defendants actions and inactions—including obstruction of access to their medical services, delays and denials of medical services including surgeries—have resulted in limiting health care access for Plaintiff, a Medi-Cal Enrollee, by, among other things, limiting the number of physicians and other providers willing to serve M-C Enrollees, and by giving preference to patients with private insurance or Medicare, by reserving for their exclusive use appointments and beds which are, due to Medical Provider Defendants' policies and methods of administration, unavailable to Plaintiff.

271. Medical Provider Defendants' actions and inactions discriminate against Plaintiff, an Adaptive person with disabilities.

Defendants' policies limiting the number of physicians and other providers that will accept Medi-Cal disproportionately harm Plaintiff, an Adaptive person with disabilities requiring more medical services than a typical "Enabled," patients. These violations are ongoing, and in accordance with the Continuity and Separate Violations Doctrines, past acts are included herein.

272.  Medical Provider Defendants' actions and inactions result in segregating the health care system when, by law, California's health care system is intended to be a single, integrated system in which Medi-Cal participants receive equal access to health care as the rest of the insured population. Instead, Defendants' actions and inactions have created a two-tier system: an inferior tier for Medi-Cal recipients and a superior tier for people with Medicare and private insurance. The two-tier system defeats the objectives and purposes of the Medi-Cal program.

273.  Medical Provider Defendants' actions and inactions violate the rights of Plaintiff under Section 11135 and Section 11154(i)(2); wherefore, Plaintiff is entitled to damages.

### b. Discriminatory Purposes

274.  Defendants' actions and inactions described above have been taken with unlawful, discriminatory intent, motivated by anti-Adaptive (persons with disabilities) animus. Evidence of such discriminatory intent includes, but is not limited to, Defendants' numerous departures from normal procedures for administration and provision of medical services. These violations are ongoing, and in accordance with the Continuity and Separate Violations Doctrines, past acts are included herein.

275.  Defendants' actions and inactions violate the rights of Plaintiff under Section 11135 and Section 11154(i)(2); wherefore, Plaintiff is entitled to damages.

**Deprivation:**

**a. Discriminatory Effects**

276.  Plaintiff re-alleges and incorporates by reference all preceding allegations in the complaint as though fully set forth here.

277.  It is a discriminatory practice under Section 11135 for a state-funded program or a program conducted, operated or administered by a state agency to deprive Medi-Cal Enrollees from or limit the provision of its benefits as that program's benefits are increasingly extended to members of a protected class.

278. It is a discriminatory practice under Section 11154(i)(2) to implement "criteria or methods of administration that . . . have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of . . . [a] program with respect to" Adaptive persons with disabilities, i.e., persons "of a physical or mental disability."

279.  Defendants have discriminated against Plaintiff by depriving him of Medi-Cal's benefits and their medical services. Defendants' deprivations constitute a method of administration that has the effect of defeating and/or substantially impairing the objectives of Medi-Cal with respect to Plaintiff, an Adaptive person with disabilities. Defendants' deprivations include imposing administrative barriers to care and delaying or denying appropriate and timely medical services, including surgeries.

280.  By refusing to accept Medi-Cal's reimbursement, albeit a reduced rate, Defendants increasingly fail through their methods of administration and medical practice to ensure Plaintiff has full access to

their medical services, causing an unjustified disparate impact on Plaintiff, an Adaptive person with disabilities in need of numerous surgeries, in the form of significantly reduced and inadequate access to medical services, seriously depriving Plaintiff of his entitlements and harming his health. These violations are ongoing, and in accordance with the Continuity and Separate Violations Doctrines, past acts are included herein.

281. Defendants' deprivations have a disparate impact upon Plaintiff, an Adaptive person with disabilities, and their deprivation builds upon and perpetuates past discrimination against Adaptive persons with disabilities.

282. The inadequate access driven by this deprivation is compounded by Defendants administrative barriers created to serve their tendency to decline Medi-Cal and/or deprive Plaintiff of his Medi-Cal benefits by administering their medical services in a discriminator manner.

283. Defendants' deprivations violate the rights of Plaintiff under Section 11135 and Section 11154(i)(2); wherefore, Plaintiff is entitled to damages.

### b. Discriminatory Purpose

284. Defendants' deprivations constitute unlawful, intentional discrimination, motivated by anti-Adaptive persons with disabilities animus. Defendants carried out this intentional unequal treatment by purposefully depriving Plaintiff of Medi-Cal's benefits over time. Evidence of Defendants' discriminatory intent includes, but is not limited to, the following:

- Defendants' deprivations of Medi-Cal's intended benefits and undermining of its objectives;
- Defendants' departures from their normal procedures for administration and provision of their medical services

- Defendants' failure to provide surgical services their preliminary evaluations justify;

- Defendants' neglect of the foreseeability of harm from their actions and inactions to Plaintiff, an Adaptive person with disabilities;

- Defendants' failure to submit Treatment authorization requests to Medi-Cal and their failure to respond to Medi-Cal's deferrals and requests for further medical justification;

- Other factual and expert evidence to be identified and produced in discovery, and offered at trial.

- These violations are ongoing, and in accordance with the Continuity and Separate Violations Doctrines, past acts are included herein.

285.  Defendants' purposeful deprivations violate the rights of Plaintiff under Section 11135 and Section 11154(i)(2); wherefore, Plaintiff is entitled to damages.

## FOURTH CAUSE OF ACTION:

### Cal. Const. Art. I, § 7(a) & Art. IV, § 16(a)

### California Constitution – Equal Protection

### Discrimination

### a. Discriminatory *Effects*

(By Plaintiff against all Medical Provider Defendants)

286.  Plaintiff re-alleges and incorporates by reference all preceding allegations in the complaint as though fully set forth herein.

287.  As set forth above, Defendants fail to provide equal access to medical services. Plaintiff, an Adaptive person with Disabilities belongs to a

protected class under the California Constitution. Access to health care is a fundamental right under the California Constitution.

288. Plaintiff, a Medi-Cal Enrollee, is similarly situated to the remainder of the general insured population with regard to his health care access under the California Constitution because (a) access to health care is a fundamental right; (b) the California Legislature has declared that the Medi-Cal program is intended to provide Medi-Cal participants with access that is equal to the access that exists for people with Medicare and private insurance, a requirement also reflected in the federal Medicaid Act and Section 14079; and (c) All medical providers and facilities are licensed and certified by the State of California, and those providers and facilities must serve Medi-Cal, Medicare, and private-pay patients alike.

289. Defendants' challenged conduct has an unjustified discriminatory effect on Plaintiff, an Adaptive person with disabilities enrolled in Medi-Cal, as compared to the remainder of the general insured population, which is disproportionately, "Enabled," or not like-disabled.

290. Defendants have violated the rights of Plaintiff to receive equal protection of the laws, pursuant to Article I, section 7(a) and Article IV, section 16(a) of the California Constitution, by failing to provide him with access to their medical services comparable to the remainder of the general insured population.

### Discriminatory *Purpose*

291. Defendants' unlawful conduct is intentional. Plaintiff has given notice of his claims to the Defendants but Defendants have provided no relief. Defendants are aware of the harm that their denial of medical services and discrimination is causing Plaintiff and have failed to remedy

the grave access disparities and ongoing harm to his health despite their knowledge.

292. Defendants' deprivations of Medi-Cal Benefits, continued egregious failure to provide the outstanding surgeries, departures from standard protocol and legal requirements, which has a disproportionately adverse impact upon Plaintiff, an Adaptive person with disabilities enrolled in Medi-Cal, and demonstrates unlawful discriminatory intent on the part of the Defendants. Plaintiff intends to ascertain further evidence of discriminatory intent in discovery.

293. Defendants have violated Plaintiff's rights to receive equal protection of the laws, pursuant to Article I, section 7(a) and Article IV, section 16(a) of the California Constitution, by discriminating against him based on his status as an Adaptive person with disabilities, contrary to their duties with Medi-Cal to ensure access to care for all Medi-Cal Enrollees equal to the access to care of the remaining general insured population.

### Discriminatory *Effects* Based on Deprivations

294. Defendants have discriminated against Plaintiff by depriving him of the Medi-Cal program's benefits and their medical services as Plaintiff's disability-based medical needs grew and animosity toward him escalated.

295. Medi-Cal Enrollees are trapped by economic forces, including but not limited to supply and demand-side economic factors indicating that medical providers are reluctant to accept Medi-Cal due to is abysmally low reduced reimbursement rate, and, payments to physicians should be rising to keep pace with the market, such as shrinking physician supply, rising physician business costs, industry-wide physician consolidation, and increasing payments from other payors competing for the same limited

supply of physician services. Therefore, Defendants elected to delay and deny Plaintiff surgeries due to these restrictive economic dynamics rather than campaign, lobby or legally challenge the obvious deficiency in Medi-Cal's reduced reimbursement rate—despite the fact that they or their employers are contracted with Medi-Cal and agreed to accept the rates.

296. Defendants' challenged conduct of deprivation has an unjustified, disproportionate discriminatory effect upon Plaintiff, an Adaptive person with disabilities, who is currently a member of a minority within the Medi-Cal program and as protected by pertinent state and federal laws.

297. This deprivation has built upon and perpetuated past discrimination and grown as Plaintiff, an Adaptive person with disabilities' medical needs grew and the costs of those services rose. Defendants have thus violated the rights of Plaintiff to receive equal protection of the laws, pursuant to Article I, section 7(a) and Article IV, section 16(a) of the California Constitution, depriving Plaintiff of Medi-Cal's program benefits as Plaintiff's need for Defendant's medical services and the cost of those services grew.

### Discriminatory *Purpose* Based on Deprivation:

298. Defendants intentionally discriminated against Plaintiff, an Adaptive person with disabilities, by increasingly flouting the law's equal access requirements and purposefully depriving him of Medi-Cal's benefits and their medical services over time as his disability-based medical needs grew and the costs of appropriate medical services rose, respectively.

299. Defendants' discriminatory intent is further demonstrated by the context for this deprivation, contemporaneous failures to follow regulatory and statutory requirements governing the administration of medical services, neglect of the foreseeability of harm to Plaintiff, an Adaptive

persons with disabilities, from their actions and inactions, delays and denials of medical services and other evidence to be identified in discovery.

300.  Defendants' deprivations perpetuate and build upon past discrimination and Defendants' delays and denials increased as a result of the increase in costs of treating Plaintiff, an Adaptive person with disabilities, increased, escalating their Adaptive-Animosity against him.

301.  Defendants have thus violated the rights of Plaintiff to receive equal protection of the laws, pursuant to Article I, section 7(a) and Article IV, section 16(a) of the California Constitution by failing to provide him with access to necessary medical services and surgeries.

## FIFTH CAUSE OF ACTION

Cal. Const. Art. 1, §7(a)

### California Constitution – Substantive Due Process

(By Plaintiff against all Medical Provider Defendants)

302.  Plaintiffs re-allege and incorporate by reference all preceding allegations in the complaint as though fully set forth herein.

303.  Article 1, section 7(a) of the California Constitution guarantees Plaintiff the right of substantive due process, which prohibits Defendants from infringing on Plaintiff's constitutionally protected property and liberty interests, or fundamental rights, in a manner that shocks the conscience.

304.  As state and federally funded medical providers, Defendants, both private and public contracted medical providers are charged with the duty of fulfilling the Medi-Cal program by providing appropriate and timely medical services to its Enrollees. Defendants have had ample time and opportunity to consider how their challenged conduct would likely harm Plaintiff's health, and acted with knowledge and deliberate indifference in failing to ensure adequate access to medical services as required by law.

Defendants substantially infringed state and federal laws because of their animus and injurious indifference for Plaintiff, an Adaptive person with disabilities, due to his disabilities.

305. Defendants intentionally discriminated against Plaintiff, a member of a protected minority class within Medi-Cal Enrollees, by treating him worse than the majority "Enabled" or "not like-disabled" Enrollees in order to deny him their medical services and subsequently provide them to other patients who paid more through their alternative insurance, thereby actively and effectively discriminating against Plaintiff. Defendants carried out this intentionally unequal provision of their medical services by depriving Plaintiff of his Medi-Cal benefits, despite the fact they subscribed to Medi-Cal and despite their knowledge of the injuries Plaintiff sustains from their denials of medical services, including surgeries.

306. Defendants intentionally discriminated against Plaintiff, an Adaptive, by violating the constitutional protections and the state civil rights law's prohibiting deprivation from a state-funded benefits program. Defendants' intentional deprivations were motivated by their anti-Adaptive animus and injurious indifference and carried out in violation of Article I, section 7(a) and Article IV, section 16(a) of the California Constitution; Government Code section 11135; and California Code of Regulations, title 2, section 11154.

307. Defendants intentionally discriminated against Plaintiff, an Adaptive, by violating the time, distance, and provider-patient ratio standards, which require, *inter alia*, that primary care physicians are no more than thirty minutes or fifteen miles from the residence of Medi-Cal enrollees; and that Medi-Cal enrollees do not have to wait more than fifteen days for an appointment with a specialist. They intentionally discriminate

against Plaintiff, an Adaptive, through other methods of administration that constitute unlawful discrimination. Defendants blatantly violated the state and federal standards for the provision of medical services.

308.  Defendants undertook the duty to provide Plaintiff with sufficient access to their medical service by subscribing to the Medi-Cal program, holding themselves out and presenting themselves to Plaintiff as a sufficient source of medical services for him, an Adaptive, indigent Californian who cannot afford alternative health care coverage.

309.  Defendants have acted and continue to act with deliberate indifference, which is beyond negligent. Defendants engage in conscience-shocking behavior by having actual knowledge that they have created an objectively, sufficiently serious risk to Plaintiff's well-being and known medical needs by subscribing to undertake the duty of providing adequate access to medical services for Plaintiff, and then deliberately violating state and federal minimum access standards and deliberately depriving Plaintiff of his Medi-Cal program benefits because they wanted to withhold their services and provide them to better-paying patients, and actively and effectively "punish" Plaintiff, an Adaptive person with disabilities for requiring what they wrongfully perceive to be, "*Excessive*," medical services, including surgeries, by denying him the appropriate and timely medical services for his "*substantial and inherent*" medical needs.

310.  Defendants violated Plaintiff's due process rights by creating an excessive health risk to Plaintiff and his known medical needs and then disregarding him despite their legal duty to provide Plaintiff adequate access to their medical services. Defendants intentionally denied and delayed Plaintiff's access to needed medical services knowing that their administration of their medical service provision programs created

conditions posing a risk of objectively, sufficiently imposing serious harm to Plaintiff's health if he did not receive needed medical services.

311.  Defendants' administration of their medical service provision programs deliberately flouts state and federal minimum access laws as well as anti-discrimination laws and constitutional protections. Defendants undertook the duty of providing Plaintiff with the means of accessing medical services, but then deprived Plaintiff adequate access to needed care despite the known risk and actual outcome of harming his health.

312.  Defendants knew about Plaintiff's medical needs and intentionally denied and delayed Plaintiff's access to needed treatment, which harms Plaintiff's health and deprives him of his constitutionally protected property interests, liberty interests, and fundamental rights.

## SEVENTH CAUSE OF ACTION

### Assault and Battery

(By Plaintiff against Medical Provider Dignity Health, Saint Bernardine Medical Center and its Private Security Officers (Names Unknown) and Defendants UC Regents, UCLA Medical Center and UCLA Police Officers (Names Unknown)

313.  Plaintiff re-alleges and incorporates by reference all preceding allegations in the complaint as though fully set forth herein.

314. About August 13, 2020, Defendants Dignity Health, St. Bernardine Medical Center and its private security officer assaulted and battered Plaintiff causing suffering, injury, emotional distress and their actions constitute ability-based discrimination.

315. Without consent, Defendants intentionally assaulted and physically battered Plaintiff with the intent to harm Plaintiff as described

herein. Such conduct was extreme and outrageous and would be deemed highly offensive to a reasonable person.

316. As a result of the aforementioned conduct, Plaintiff was physically and emotionally damaged by both the violence and Defendants' violations of his civil rights. Defendants acted with malice and oppression and with a conscious disregard of Plaintiff's rights, making them liable for punitive damages under California Civil Code § 3294.

317. About September 15, 2020, Defendants UC Regents, UCLA Medical Center and UCLA Police used excessive force and assaulted and battered Plaintiff causing suffering, injury, emotional distress and their actions constitute ability-based discrimination and additional violations of Plaintiff's additional civil rights.

318. Without consent, Defendants wrongfully and intentionally assaulted and physically battered Plaintiff under the color of law with the intent to harm Plaintiff as described herein. Such conduct was extreme and outrageous and would be highly offensive by a reasonable person. As a result of the aforementioned conduct, Plaintiff was physically and emotionally damaged by both the violence and Defendants' violations of his civil rights.

319. Defendants acted with malice and oppression and with a conscious disregard of Plaintiff's rights, making them liable for punitive damages under California Civil Code § 3294

### EIGHTH CAUSE OF ACTION

Cal. Code Regs. Tit. 2 § 1278.5

### Retaliation

(By Petitioner Against All Medical Provider Respondents)

320.  Plaintiff re-alleges and incorporates by reference all preceding allegations in the complaint as though fully set forth herein.

321. Plaintiff filed complaints and grievances for ability-based discrimination, the injurious denials of medical services including surgeries and unsafe patient care and conditions and assault.

322. Defendants unlawfully retaliated against Plaintiff when he notified them of their discriminatory actions and policies that excluded him and continue to exclude him from their medical goods, services and surgeries, and Defendants UC Regents, UCLA Medical Center and UCLA Police as well as Dignity Health, St. Bernardine Medical Center and its private security officer assaulted him and created unsafe patient care and conditions. Instead of rectifying their discriminatory policies in a timely and just manner, Defendants elected to ban Plaintiff from their medical centers and offices and delayed and/or denied administrative and medical services while knowing he required multiple surgeries to treat his exacerbated disabilities including heart surgery, spine surgeries, neurosurgeries, and orthopedic surgeries.

### NINTH CAUSE OF ACTION

Code of Civ. Proc. § 3294

**Fraud**

(By Plaintiff Against All Medical Provider Defendants)

323.  Plaintiff re-alleges and incorporates by reference all preceding allegations in the complaint as though fully set forth herein.

324.  Defendants committed and continue to commit fraud by falsely inducing Plaintiff, an Adaptive person with disabilities in need of medical treatment including surgeries, to attend their medical centers and offices and receive preliminary care from their physicians while deceitfully

intending to deny appropriate, necessary and timely medical treatment including surgeries and refusing to accept Medi-Cal coverage despite their contractual duties with California's Medi-Cal program to provide all necessary medical treatment to Medi-Cal enrollees in a timely manner.

325. Defendants' "cherry-pick," Medi-Cal patients. They accept and/or approve the more lucrative and/or less costly Medi-Cal patients or cases—those for whom the profit-to-cost differential is higher—and deny those with more complex and therefore more costly—lower profit-to-cost differential—cases of Plaintiff and Adaptive patient with disabilities needing numerous costly surgeries.

326. Affiliated, employed and subscribed physicians, technicians and surgeons deny Plaintiff, an Adaptive person with disabilities enrolled in Medi-Cal, while falsely assuring both the Adaptive patient with disabilities and the Medi-Cal Agency's Administration that patients like Plaintiff will receive all necessary medical care including surgeries in a timely manner.

327. Defendants allow for their affiliated, employed and subscribed physicians, technicians and surgeons to deny Plaintiff, an Adaptive person with disabilities enrolled in Medi-Cal, while falsely assuring both the Adaptive patient with disabilities and the Medi-Cal Agency's Administration that patients like Plaintiff will receive all necessary medical services including surgeries in a timely manner. Their actions and assurances are acts of fraud of the gravest degree.

328. Defendants inflict inhumane harm upon Plaintiff, an Adaptive person with disabilities, requiring extensive medical treatment including surgeries, by refusing appropriate and timely medical treatment including surgeries, after falsely misleading him while in a critical and sometimes life-threatening position of severely compromised health, that they intend to

provide all necessary, appropriate medical services in a timely manner after completion of said preliminary care, assessment and evaluations.

329.  Defendants did and continue to receive funds from Medi-Cal as well as other state and federal funding sources and charge Plaintiff, an Adaptive person with disabilities enrolled in Medi-Cal like, fraudulent billing for preliminary care, evaluations and imaging. They fraudulently induce Plaintiff to accept the preliminary care while intending to deny access to and ultimately the receipt of actual necessary treatment, including final medicinal or therapeutic medical goods, services and treatment including surgeries. Defendants thereby caused Plaintiff and the State of California to suffer financial loss through their discriminatory, fraudulent billing actions and policies and medical actions. All such billing by Defendants creates a non-dischargeable lien against Plaintiff, a Medi-Cal enrollee.

330.  Defendants did and continue to manipulate exam findings and medical protocol to generate false justifications for their discriminatory and fraudulent denials of all necessary, appropriate and timely medical services including surgeries for Plaintiff, an Adaptive person with disabilities enrolled in Medi-Cal.

331.  Defendants falsely and fraudulently represented to Plaintiff that they would provide necessary timely medical treatment including multiple surgeries. Defendants' representations were in fact false. The true facts were Defendants delayed and denied medical services including surgeries, discriminated against Plaintiff and harassed and retaliated against him when he objected to their violations of his civil rights and sought remedy.

332.  When Defendants made these representations, they knew them to be false, and these representations were made by Defendants with the intent to defraud and deceive Plaintiff and with the intent to induce him to

act in the manner herein alleged. At the time Defendants made the promises to Plaintiff, Defendants had no intention of performing them.

333. Plaintiff, at the time these representations were made by Defendants and at the time he took the actions herein alleged, was ignorant of the falsity of Defendants' representations and believed them to be true.

334. Plaintiff, at the time these promises were made and at the time he took the actions herein alleged, was ignorant of Defendants' secret intention not to perform and Plaintiff could not, in the exercise of reasonable diligence, have discovered Defendants' secret intention. In reliance on these representations, Plaintiff was induced to and did suffer severe pain and injury as he made himself available to Defendants for medical services but was wrongfully delayed and denied care, provided the wrong care and mutilated.

335. If Plaintiff had known of the actual intention of Defendants, he would not have taken such action. Plaintiff's reliance on Defendant's representations was justified because he was and remains in desperate need of multiple surgeries to treat his exacerbated disabilities and it was reasonable for him to believe Defendants' inducements that they would fulfill their promises, provide appropriate timely medical services including surgeries and honor their Hippocratic Oath to do no harm.

336. As a proximate result of Defendants' fraud and deceit and the facts herein alleged, Plaintiff was injured and continues to be injured by reason of which Plaintiff has been damaged in the sum to be established at trial. In doing the acts herein alleged, Defendants acted with oppression, fraud, and malice, and Plaintiff is entitled to punitive damages in the sum to be determined at trial.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TENTH CAUSE OF ACTION

Cal. Code of Civ. Proc. § 3300

### Breach of Contract

(By Plaintiff Against All Medical Provider Defendants)

337.  Plaintiff re-alleges and incorporates by reference all preceding allegations in the complaint as though fully set forth herein.

338.  In exchange for payment, Defendants entered into oral and written contracts to provide health care services to Plaintiff with Plaintiff and Medi-Cal, his medical service coverage provider (insurer). The material terms of these contracts include, without limitation, that Plaintiff was to have timely access to medically necessary diagnosis, assessment, evaluation, care and treatment and that Defendants would provide such services for payment by Medi-Cal. This includes timely referral services to appropriate specialists and timely provision of that specialty services.

339.  As per the contracts, Defendants agreed to provide Plaintiff with specialist care when he needs care that his primary care physician cannot provide. His Primary Care Physician has the responsibility to refer him to that specialist but most times refused to perform that duty. If and when Plaintiff obtains a referral, it is then the specialist's responsibility to submit a "Treatment Authorization Request," (TAR) to Medi-Cal, but most times, specialists refused to perform that duty or fialed to submit and adequate referral or failed to respond to Medi-Cal's Deferral and request for additional medical justification. Their refusal not only obstructed Plaintiff from obtaining the treatment, it also prevented him from obtaining a remedy through the Dept. of Social Services because remedial services are contingent upon the issuance of a TAR—an absurd self-defeating

monitoring system designed and implemented by the State Agency Defendants and exploited by Medical Provider Defendants.

340. Defendants breached these terms by a) primary care physicians' delaying or failing to refer Plaintiff to a specialist; b) specialists refusing medical care services and failing to submit a Treatment Authorization Request and/or authorize or otherwise arrange for treatment (whether the specialist was within or outside the medical center/plan), after being advised by Plaintiff of his urgent condition, or gathering evidence of his need for specialty services through relevant evaluations, testing and imaging, and thereby comply with their requirements and fulfill their promises to provide timely specialist care; c) failing to otherwise arrange for treatment, and thereby fulfill their promises to provide timely specialist care for Plaintiff's exacerbated disabilities, disorders and injuries.

341. As a proximate cause of Defendants' breach, Plaintiff has suffered physical injury, economic loss, and emotional distress, all in a sum to be proven at the time of trial.

### ELEVENTH CAUSE OF ACTION

Cal. Code of Civ. Proc § 1714

### Negligence

(By Plaintiff Against All Medical Provider Defendants)

342. Plaintiff re-alleges and incorporates by reference all preceding allegations in the complaint as though fully set forth herein.

343. Defendants owed Plaintiff a duty of care which included a duty to provide him with timely access to medical services and treatment in a reasonable period of time as they had promised him they would provide.

344.  Defendants breached this duty by failing to provide Plaintiff with timely access to multiple specialty surgeons qualified and willing to provide Plaintiff with the evaluation, surgery and treatment that he needed.

345.  As a result of Defendants' breaches, Plaintiff missed the time period in which he could have received the necessary surgeries and he has suffered physical injury, economic harm, and emotional distress.

346.  As a proximate result of defendant's negligence and the facts herein alleged, plaintiff was injured and continues to be injured by reason of which plaintiff has been damaged in the sum to be established at trial.

### TWELFTH CAUSE OF ACTION:

### Violation of California's Antitrust and Unfair Competition Law

Bus. & Prof. Code § 17200, Unfair Competition Law

Bus. & Prof. Code § 16720, The Cartright Act

(By Plaintiff Against All Medical Provider Defendants)

347.  Plaintiff re-alleges and incorporates by reference all preceding allegations in the complaint as though fully set forth herein.

348.  Defendants partake in and contribute to a system of deprivation and exploitation of the underprivileged California residents enrolled in Medi-Cal. This collusion can be described as the inversion of California's socialized medical service program for the unjust enrichment and self-preservation of those who, ironically, have accepted the duty to protect the enrollees. Instead, Defendants act in unison to financially gain at the expense of enrollees who are denied appropriate, timely medical services.

349.  This way, Defendants partake in an illegal oligopoly of the lower socio-economic strata of the medical service industry and deprive and injure Plaintiff, an Adaptive person with disabilities enrolled in Fee-For-

Service Medi-Cal. For nine years, they repeatedly delayed and denied Plaintiff many surgeries, causing him severe injury.

350.  Though difficult to accept, the medical providers, the third leg to this inverted pyramid of corruption, act with indifference and willingly deliver the final denial, often through deflection. Their declination is the final act in the extensive inverted program of social service cronyism.

351.  The lethal point of California's nabla of Medi-Cal corruption bears down on the most vulnerable enrollees, works with combined state and federal capital and combined administrative and medical skills, and the parties act in unison to restrict the medical service trade to deny enrollees of their benefits to divert funds to alternative political use and personal gain.

352. Defendants engaged in unlawful, unfair and fraudulent business acts and practices and were deceptive in their advertising, publications and statements. Their public policies and practices are immoral, unethical, oppressive and unscrupulous and substantially injured Plaintiff and caused him to lose money and deprived him of his property, health and well-being.

### THIRTEENTH CAUSE OF ACTION:

### Slander and Libel Per Se

California Civil Code § 44, Defamation

(By Plaintiff Against Defendants UC Regents, UCLA

and Andrew Vivas, M.D.)

353.  Plaintiff re-alleges and incorporates by reference all preceding allegations in the complaint as though fully set forth herein.

354.  Plaintiff discovered Defendants' defamation about August 6, 2022, when reviewing his medical records. Defendants UC Regents, UCLA

Case 2:22-cv-07976   Document 1   Filed 11/01/22   Page 92 of 94   Page ID #:92

and Andrew Vivas, M.D., defamed Plaintiff and are liable for libel per se by their false and unprivileged publication by writing, which exposed Plaintiff to contempt, ridicule, and obloquy, and which caused him to be avoided, and denied medical services, and injured him in his main, full-time occupation of seeking life-sustaining surgeries to address his exacerbated disabilities.

355.  Defendants UC Regents, UCLA and Andrew Vivas, M.D., made defamatory statements against Plaintiff and they knew or should have known they were false and they disseminated them through publication and their defaming statements were of and concerning Plaintiff and as a proximate result thereof, Plaintiff suffered damages and harm.

356.  Defendants UC Regents, UCLA and Andrew Vivas, M.D., made statements to persons other than Plaintiff and those persons reasonably understood the statements to mean that Plaintiff is mentally ill, problematic and troublesome and does not suffer Arachnoid Web of the Spine.

357.  Defendants UC Regents, UCLA and Dr. Vivas' abandonment and denial of spine surgeries preceded and caused the ensuing conflict.

358.  Defendants UC Regents, UCLA and Andrew Vivas, M.D., failed to use reasonable care to determine the truth or falsity of their statements and their defaming statements were unprivileged communication to a third party, and their defaming statements caused harm to Plaintiff's reputation.

359.  Defendants UC Regents, UCLA and Andrew Vivas' defamation per se damaged Plaintiff as it attacked and harmed Plaintiff's desperate full-time occupation of searching for medical services, about twelve surgeries, including two spine surgeries, to treat his exacerbated disabilities, by characterizing him as mentally ill and problematic and denying Plaintiff's eligibility and justification for spine surgeries.

360.  Defendants UC Regents, UCLA and Andrew Vivas, M.D., made their printed statements with reckless disregard of its accuracy, actual malice and negligence and Defendants elected to pathologize the patient rather than treat his pathologies and Plaintiff suffered harm to his reputation and shame and hurt feelings. Therefore, Plaintiff is entitled to damages, including punitive damages.

**PRAYER FOR RELIEF:**

WHEREFORE Plaintiff prays for judgment and the following specific relief:

a)      A declaration that Defendants' have violated the rights of Plaintiff to be free from discrimination and entitled to equal protection and substantive due process under the California and United States' Constitutions;

b)      Removal of all fraudulent charges contained within Plaintiff's Medi-Cal lien;

c)      Reasonable attorney fees and costs of suit;

d)      Such other and further equitable relief as this Court may deem appropriate and just.

e)      Damages.

Dated August 13, 2022                    Respectfully submitted,

*Hoyt E Hart II*
_____
Hoyt E Hart II
Attorney at Law

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28